[Nos. H013360, H015090, H015511, H016104, H016674, H016805, H016806, H017215. Sixth Dist. Mar. 3, 1998.]

FMC CORPORATION, Plaintiff and Appellant, v.
PLAISTED AND COMPANIES et al., Defendants and Appellants.

1134

1136

## COUNSEL

Troop, Meisinger, Steuber & Pasich, David W. Steuber, Mary Craig Caulkins, Catherine L. Rivard, Jeffrey M. Jacobberger, Holland & Hart, R. Brooke Jackson, Jack M. Englert, Neil G. Epstein, John F. O'Riordan and Bowen H. Tucker for Plaintiff and Appellant.

Hancock, Rothert & Bunshoft, Paul J. Killion, Barry L. Bunshoft, W. Andrew Miller, Peter J. Whalen, Michael L. Donovan, Monica M. Slakey, Colleen A. Cassidy, Lisa A. Mango, Mary C. Anderson, Katherine A. Knopoff, John Garnett, Eve F. Lynch, Rice, Fowler, Booth & Banning, Elizabeth R. Palmer and Kurt Micklow for Defendants and Appellants.

Bien & Summers, Elliot L. Bien and Lon A. Berk as Amici Curiae on behalf of Defendants and Appellants.

## OPINION

**BAMATTRE-MANOUKIAN, J.**—These eight appeals arise from a single superior court action, and address specific aspects of the duty of a general liability insurer to indemnify its insured for the cost of reimbursing government agencies and of complying with orders for investigation and remediation of toxic contamination to soil, surface water, and groundwater beneath the surface of the soil.

The general liability insurance policies, issued by London insurers, are of the type known in American insurance practice as comprehensive or commercial general liability (or CGL) policies. The policies contain indemnification provisions similar to those of standard form CGL policies but omit the explicit duty-to-defend provisions commonly included in CGL policies. The policies' indemnification provisions require, in pertinent part and subject to many qualifications, that the insurer indemnify the insured for all sums the insured shall be obligated to pay by reason of liability for property damage as defined. In a writ proceeding arising out of this action the Supreme Court has established as general propositions, and insofar as applicable to these policies, that contamination of the environment is property damage and, in essence, that amounts the insured is required to pay to reimburse government agencies and to comply with government orders under statutes such as the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) (42 U.S.C. § 9601 et seq.) and similar statutes, once hazardous wastes have been released, are sums the insured is obligated to pay by reason of liability for property damage. (*AIU Ins. Co.* v. *Superior Court* (1990) 51 Cal.3d 807, 824-843 [274 Cal.Rptr. 820, 799 P.2d 1253].) These appeals call upon us to resolve additional coverage issues, as well as procedural and evidentiary questions which arose in the course of trial.

FMC Corporation, a diversified manufacturer of equipment and chemical compounds, acknowledges that over a period of many years its commercial activities, and the activities of others at sites for which FMC was or became responsible under environmental laws, caused toxic contamination to soil and groundwater at and near many sites throughout the country. Beginning as early as 1959, FMC spent substantial sums to investigate the nature and extent of the contamination, to undertake measures of its own to remediate

the contamination, to reimburse government agencies for their remediation work, and to comply with related orders of state and federal agencies.

Throughout the relevant period FMC had purchased and maintained extensive general liability insurance. Liberty Mutual Insurance Company provided FMC's primary coverage to limits of $10 million. FMC also bought umbrella and excess coverage provided by a number of insurers including certain underwriters at Lloyds of London and certain London insurance companies. We shall refer to these London underwriters and insurance companies, including one company that engaged separate counsel in the course of the proceedings, as "the London insurers" or "the London defendants," and to the umbrella and excess policies they issued as "the London policies." Many other insurers were involved in the proceedings below, but of all of FMC's insurers only the London defendants are now before this court. Exhaustion of FMC's primary coverage (cf. *Community Redevelopment Agency* v. *Aetna Casualty & Surety Co.* (1996) 50 Cal.App.4th 329, 337-340 [57 Cal.Rptr.2d 755]) is not an issue on these appeals.

Early in November 1987, FMC for the first time formally demanded that the London defendants investigate, defend and indemnify FMC with respect to toxic contamination at specified sites. Eleven days later FMC brought this action, against Liberty Mutual, the London defendants and many other insurers, for a declaration of rights as against all the insurers and for damages as against Liberty Mutual. Over a period of nearly 10 years, many of the sites for which, and many of the insurers against which, FMC had claimed coverage were removed from the action by pretrial order, voluntary dismissal, or stipulated disposition. In 1988, a few months before he was appointed to this court, the action was assigned to the Honorable Eugene M. Premo for all purposes, and he continued as single-assignment judge in the action until the spring of 1993, shortly before trial began. Justice Premo has taken no part in the consideration or decision of the issues on this appeal.

Beginning in 1993, a total of fifty-seven sites were assigned for trial in eight groups, with eight separate juries empaneled to hear factual issues and render special verdicts at a series of eight separate trial phases to which we shall refer (as the court and counsel did in the trial court) as "trials." Of the 57 sites 4 did not involve the London defendants, and of the remaining 53 more than half were removed from jury consideration by dismissal, stipulation, or court order in the course of pretrial and trial proceedings. Thus, for example, of the six sites assigned to the first trial, two were dismissed by FMC before trial, one was dismissed by stipulation among the parties, one did not involve the London defendants, and only the remaining two went to

special verdicts and judgment with respect to the London defendants. And although all of the six sites assigned to the second trial went to judgment as to the London defendants, as to one of the sites the judgment was based on a summary adjudication order and as to another it was based on the parties' stipulation. By the time the last trial was concluded, in early 1997, a total of 35 sites had gone to judgment with respect to the London defendants, 22 of them on the basis of special verdicts. By this time only the London insurers remained as defendants.

Following each of the eight separate trials the trial court entered a separate, detailed recitation of the proceedings had, findings made, and conclusions reached at that trial. Each of these eight recitations was denominated a "judgment." Neither FMC nor the London defendants were fully satisfied with any of these eight "judgments": FMC appealed, and the London defendants cross-appealed, from each of them. This court concluded that the interests of justice would best be served by considering the eight appeals together.

Three issues lend themselves to summary disposition:

(1) *Appealability.* The London defendants initially took the position that none of the individual "judgments," viewed in isolation, could be deemed a single *final* judgment disposing of all issues or be brought within an exception to the one final judgment rule, and therefore that none of the individual "judgments" was separately appealable. (Cf. *Morehart* v. *County of Santa Barbara* (1994) 7 Cal.4th 725, 736-744 [29 Cal.Rptr.2d 804, 872 P.2d 143].) This court's decision to consider the appeals from the eight separate "judgments" together effectively moots the appealability issue: We shall treat the eight "judgments" heretofore entered collectively, as a single judgment disposing of all issues, and the eight appeals as a single collective appeal from that single judgment. For convenience we shall continue to use the terms "judgment" and "judgments," in quotation marks, to refer to the trial court's eight separate recitations.

(2) *Instructions on late-notice defense.* As to each of the two sites that reached the jury at the first trial—the Fresno site in California and the Conservation Chemical site in Kansas—the London defendants asserted as a defense that FMC had not given them the notice required by the London policies within a reasonable time. The trial court instructed the jury that, to sustain the defense, the London defendants would be required to prove they had been prejudiced by the delay. In this court FMC contends that in preinstructions the trial court improperly authorized the jury to consider prejudice to the London defendants in defending FMC's *coverage action,*

arguing that the law permits a late-notice defense only where the insurer can show it was prejudiced in asserting a defense to the *underlying claim against the insured*. But at the first trial the jury explicitly found that FMC had *not* been late in giving notice, and the point has not been raised as to any subsequent trial. Because FMC was not aggrieved by the preinstruction of which it complains, we need not reach the issue in order to dispose of FMC's appeal. We respectfully decline FMC's request that we nevertheless discuss the issue, essentially in the abstract, against the possibility it will recur in future proceedings.

(3) *Standing to raise other issues.* In their respondents' brief on FMC's first appeal the London defendants asserted that FMC lacked standing, by reason of jury findings favorable to FMC, to raise certain issues in addition to the late-notice preinstruction. It appears that each of these additional issues was subsequently raised, in one or more of the ensuing appeals, in circumstances in which FMC was in the requisite sense aggrieved and therefore had standing to raise the issues. Thus the additional issues are properly before us.

### COVERAGE ISSUES

### The Pollution Exclusions

The London defendants first provided umbrella and excess general liability coverage to FMC as of August 5, 1964, and continued to provide various coverages until 1985, but effective October 1, 1970, the London defendants incorporated into their FMC policies provisions that excluded coverage for liabilities for various kinds of releases of pollutants. For the first few years after 1970 the pollution exclusions were subject to an exception if (as worded in the London policies) "such . . . release . . . is sudden and accidental" or if (in another London form) "such . . . pollution . . . is caused by a sudden, unintended and unexpected happening . . . ." Most of FMC's claims were based on gradual releases of contaminants. Unless FMC could nevertheless invoke the exception, its coverage for environmental contamination liabilities under the London policies would be limited, for purposes relevant to these appeals, to the period from August 5, 1964, to October 1, 1970. To identify the coverage periods with which we must be concerned, we turn first to the construction to be given the exception to the London policies' pollution exclusions.

■ To invoke the exception with respect to gradual releases, FMC needed to persuade the London defendants, or the trial court, that the word "sudden," as used in each form of the exception, did not necessarily mean "abrupt" or otherwise evoke a temporal connotation. To this end FMC argued that the word was defined, was understood, and had been determined by several courts, to mean "unexpected" as an alternative to "abrupt."

After consideration of FMC's arguments and extrinsic evidence, the trial court concluded by pretrial ruling that "sudden" meant "abrupt—in a temporal sense—and was not a synonym for unexpected and unintended." This pretrial ruling was adhered to throughout the trial proceedings.

The trial court's conclusion was based in part on *Shell Oil Co.* v. *Winterthur Swiss Ins. Co.* (1993) 12 Cal.App.4th 715, 752-756 [15 Cal.Rptr.2d 815], and is also supported by *ACL Technologies, Inc.* v. *Northbrook Property & Casualty Ins. Co.* (1993) 17 Cal.App.4th 1773, 1779-1794 [22 Cal.Rptr.2d 206]. Although the issue has produced division among courts nationwide, no reported California appellate decision has contradicted the holdings of *Shell* and *ACL* that in the relevant context the word "sudden" means, at least, "abrupt," and thus does not apply to gradual releases of pollutants no matter how unexpected.

We agree with *Shell* and *ACL*, and will not expand the literature by attempting to add to their careful analyses of the issue. FMC argues that neither *Shell* nor *ACL* "analyzed the drafting and regulatory history that is so critical to our position," and that in this respect the *Shell* and *ACL* courts disregarded the rule of *Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373] (*PG&E*) that "[t]he test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." (69 Cal.2d at p. 37.) *ACL* considered and rejected similar contentions. Again, we agree with, and will not seek to add to, *ACL*'s analysis.

From our conclusion that "sudden" means, at least, "abrupt," it follows that FMC's coverage under the London policies for any discharge or release of pollutants that could *not* be shown to be abrupt would be limited to policy periods between August 5, 1964 (when the London companies first provided coverage) and October 1, 1970 (the effective date of the pollution exclusions). For the purpose of the remaining coverage issues we shall focus upon that period.

### The 1964-1970 London Policies

■ Characterization of an insurance policy as a "general liability" policy connotes neither unlimited coverage nor particular coverages. The term is more realistically viewed as a means of distinguishing policies which afford relatively broad coverages from those (such as directors and officers policies) which are explicitly limited to specifically defined areas of liability. (Cf. *Fresno Economy Import Used Cars, Inc.* v. *United States Fid. & Guar.*

*Co.* (1977) 76 Cal.App.3d 272, 279-280 [142 Cal.Rptr. 681]; cf. also 11 Couch on Insurance (2d ed. 1982) Risks and Coverages, § 44:264, pp. 410-411.) It is invariably necessary to consult the language of any particular general liability policy to determine what coverages it affords.

Between August 5, 1964, and October 1, 1970, the London companies provided a total of eight general liability policies to FMC, of which two were of particular significance to the coverage issues before us. Policy No. K 79446 was in effect, with periodic modifications, from August 5, 1964, to October 1, 1969, and was in practical effect replaced by policy No. CX2062 for the period from October 1, 1969, to October 1, 1970. These two policies, each captioned as an "umbrella policy," undertook to provide coverage immediately above and in some respects supplemental to Liberty Mutual's primary general liability coverage. The remaining six policies provided layers of excess coverage above policy Nos. K 79446 and CX2062, and in relevant respects "followed form" with—which in insurance parlance meant their terms conformed to those of (cf., e.g., *Wells Fargo Bank* v. *California Ins. Guarantee Assn.* (1995) 38 Cal.App.4th 936, 940 [45 Cal.Rptr.2d 537]; *Coca Cola Bottling Co.* v. *Columbia Casualty Ins. Co.* (1992) 11 Cal.App.4th 1176, 1182 [14 Cal.Rptr.2d 643])—the umbrella policies.

The pertinent basic provisions of policy Nos. K 79446 and CX2062 were closely similar.

The policies provided that the London insurers

| *K 79446* | *CX2062* |
|---|---|
| "agree . . . to indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of the liability [imposed by law or assumed by agreement] for damages, direct or consequential and expenses, all as more fully defined by the term 'ultimate net loss' on account of:— . . . Property Damage . . . caused by or arising out of each occurrence happening anywhere in the world." | "agree . . . to indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of the liability [imposed by law or assumed by agreement] for damages, direct or consequential and expenses, all as more fully defined by the term 'ultimate net loss' on account of:— . . . Property Damage . . . caused by or arising out of each occurrence." |

These provisions were made subject to the following "LIMIT OF LIABILITY":

*K 79446*

"Underwriters hereon shall only be liable for the ultimate net loss the excess of either

"(a) the limits of the underlying insurances as set out in the attached schedule in respect of each occurrence covered by said underlying insurances,

"or (b) $25,000 ultimate net loss in respect of each occurrence not covered by said underlying insurances,

"(hereinafter called the 'underlying limits'):

"and then only up to [specified policy limits]."

*CX2062*

"Underwriters hereon shall only be liable for the ultimate net loss the excess of the greater of

"(a) the limits of the underlying insurances as set out in the attached schedule and the amount collectible by the Assured under any other underlying insurance, in respect of each occurrence covered by said underlying insurances,

"o[r] (b) $100,000 ultimate net loss in respect of each occurrence

"(hereinafter called the 'underlying limits'):

"and then only up to [specified policy limits]."

The policies defined "PROPERTY DAMAGE" as

*K 79446*

"loss of or direct damage to or destruction of tangible property (other than property owned by the Named Assured)."

*CX2062*

"loss of or direct damage to or destruction of tangible property (other than property owned by the Named Assured)."

Throughout these proceedings the trial court and counsel have referred to property other than that owned by FMC as "third party property," and to damage to such property as "third party property damage"; occasionally they have referred to FMC's property as "owned property" and to damage to FMC's property as "first party property damage." We shall adopt this terminology. Under California law groundwater—which we broadly define as water beneath the surface of the soil—is publicly owned, and thus California groundwater would be third party property from FMC's perspective. (*AIU Ins. Co.* v. *Superior Court, supra*, 51 Cal.3d at p. 817 fn. 6; cf. Wat. Code, § 102.)

The policies defined "OCCURRENCE" as

<table>
<tr><td align="center">*K 79446*</td><td align="center">*CX2062*</td></tr>
<tr><td>"an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, property damage or advertising liability during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence."</td><td>"an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, property damage or advertising liability during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence."</td></tr>
</table>

The policies defined "ULTIMATE NET LOSS" as

<table>
<tr><td align="center">*K 79446*</td><td align="center">*CX2062*</td></tr>
<tr><td>"the total sum which the Assured, or any company as his insurer, or both, become obligated to pay by reason of personal injury, property damage or advertising liability claims, either through adjudication or compromise, and shall also include hospital, medical and funeral charges and all sums paid as salaries, wages, compensation, fees, charges and law costs, premiums on attachment or appeal bonds, interest, expenses for doctors, lawyers, nurses and investigators and other persons, and for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder, excluding only the salaries of the Assured's or of any underlying insurer's permanent employees."</td><td>"the total sum which the Assured, or any company as his insurer, or both, become obligated to pay by reason of personal injury, property damage or advertising liability claims, either through adjudication or compromise, and shall also include hospital, medical and funeral charges and all sums paid as salaries, wages, compensation, fees, charges and law costs, premiums on attachment or appeal bonds, interest, expenses for doctors, lawyers, nurses and investigators and other persons, and for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder, excluding only the salaries of the Assured's or of any underlying insurer's permanent employees."</td></tr>
</table>

*Insured Not Involved Until After Policy Period*

■ By definition, coverage under an "occurrence" liability insurance policy such as those before us requires that an event or events relevant to coverage have *occurred during* the policy period. (Cf. *A. C. Label Co.* v. *Transamerica Ins. Co.* (1996) 48 Cal.App.4th 1188, 1192 [56 Cal.Rptr.2d 207].) This concept is encapsulated in the term "trigger of coverage" which the Supreme Court, in *Montrose Chemical Corp.* v. *Admiral Ins. Co.* (1995) 10 Cal.4th 645 [42 Cal.Rptr.2d 324, 913 P.2d 878] (*Montrose II*), defined as "a term of convenience used to describe that which, under the specific terms of [a liability] insurance policy, must happen in the policy period in order for the *potential* of coverage [relevant to the duty-to-defend issues involved in *Montrose II*] to arise. The issue is largely one of timing—what must take place *within the policy's effective dates* for the potential of coverage to be 'triggered'? Whether coverage is ultimately established in any given case may depend on the consideration of many additional factors . . . ." (10 Cal.4th at p. 655, fn. 2; cf. *id.* at p. 673 et seq.; *Armstrong World Industries, Inc.* v. *Aetna Casualty & Surety Co.* (1996) 45 Cal.App.4th 1, 39 [52 Cal.Rptr.2d 690].) But "unless coverage has been triggered under these occurrence policies within the policy period, there is no coverage once the policy period has ended. [Citation.]" (*Cooper Companies* v. *Transcontinental Ins. Co.* (1995) 31 Cal.App.4th 1094, 1107 [37 Cal.Rptr.2d 508]; *A. C. Label Co.* v. *Transamerica Ins. Co., supra*, 48 Cal.App.4th at p. 1194.)

Many cases have generalized that under an occurrence-based general liability policy it is the injury or harm that triggers coverage. (Cf. *Armstrong World Industries, Inc.* v. *Aetna Casualty & Surety Co., supra*, 45 Cal.App.4th at pp. 39-40, and cases and secondary authorities cited.) In *Montrose II* the Supreme Court identified four varying "trigger theories" applied by courts under such policies (10 Cal.4th at pp. 674-676) and held that, in circumstances analogous to those of this case, liability under such policies for property damage which is "continuous or progressively deteriorating throughout successive policy periods" will be covered by "all policies in effect during those periods," under a theory which *Montrose II* labeled "[t]he continuous injury (or multiple) trigger." (*Id.* at p. 675.)

It appears to be undisputed for purposes of this appeal that the gradual release of pollutants which underlay most of FMC's coverage claims invoked *Montrose II's* continuous injury trigger, and that coverage under the London policies was triggered by any property damage in any policy period at a site with which FMC had had some involvement relevant to liability under CERCLA or comparable statutes before or during that policy period.

■ But the parties sharply disagree as to whether coverage was triggered under the London policies for property damage for which (under CERCLA

or comparable state statutes) FMC was liable even though FMC had had no involvement with the site until *after* the last relevant policy period ended on October 1, 1970.

A peculiarity of CERCLA and comparable statutes is that an entity may become liable (sometimes simply as the current owner of a site) for cleanup and remediation costs for property damage which occurred before, and sometimes long before, the entity had any involvement whatsoever. (Cf. CERCLA § 107(a), 42 U.S.C. § 9607(a); *U.S.* v. *Shell Oil Co.* (C.D.Cal. 1993) 841 F.Supp. 962, 968.) FMC found itself in this situation with respect to sites of two general kinds, labeled in motion paperwork as "category A" and "category B." "Category A" included sites at which FMC had no involvement, either directly or vicariously through a predecessor entity, until after October 1, 1970; "category B" included sites in which FMC had not been involved, but a predecessor entity (subsequently acquired by FMC) had been involved, before October 1, 1970.

No "category A" or "category B" sites were involved in the first trial. Shortly after the first trial the London defendants sought a ruling that they would not be required to provide coverage for injury for which FMC was liable under CERCLA at sites where FMC's involvement began after October 1, 1970. FMC responded that under the literal language of the policies' "occurrence" definition it would be entitled to indemnity for its *liability* for any *property damage* within a covered policy period, whether or not FMC had *caused* the property damage or had otherwise been involved during the policy period. The trial court agreed with FMC, concluding that "there is no coverage requirement that the damage be caused by the named insured" and denying the London defendants' motion. One "category A" site, Andover, in Minnesota, was assigned to the second trial, and the London defendants were found to have coverage, and to be obliged to indemnify FMC for its essentially retroactive CERCLA liability, for certain of their policy periods.

A "category B" site, Bermet, in South Carolina, was assigned to the fourth trial. The London defendants again moved for a ruling that they had no coverage, and this time the trial court, apparently influenced by the intervening appellate opinion in *Cooper Companies* v. *Transcontinental Ins. Co.*, *supra*, 31 Cal.App.4th 1094, granted the London defendants' motion, holding that there was no coverage for the Bermet site.

Three "category A" sites—Ekotek, in Utah, Delaware Sand & Gravel, in Delaware, and Global Landfill, in New Jersey—were assigned to the seventh trial, and again the London defendants made a pretrial motion for a ruling

that there was no coverage, citing *Cooper Companies* and *Armstrong World Industries, Inc.* v. *Aetna Casualty & Surety Co., supra,* 45 Cal.App.4th 1. In *Armstrong World Industries,* an asbestos products liability case, the Court of Appeal among other things construed language from *Montrose II* "to mean that exposure to hazardous conditions *after* the policy period will not trigger coverage" (45 Cal.App.4th at p. 61, fn. 24), and concluded that "[a]n insurer has no liability if its policy expired before the claimant was exposed to the policyholder's product." (*Id.* at p. 62.) The London defendants' position was also supported by this appellate district's opinion in *A. C. Label Co.* v. *Transamerica Ins. Co., supra,* 48 Cal.App.4th 1188, a groundwater contamination case on "category B" facts, which was not yet final at the time the London defendants' motion was heard.

FMC sought to distinguish *Cooper Companies* and *A. C. Label,* but conceded that, although it disagreed with *Armstrong World Industries,* the trial court would be obliged under *Armstrong World Industries* to dismiss FMC's coverage claims as to Ekotek, Delaware Sand & Gravel, and Global Landfill. The trial court granted the London defendants' motion on the basis both of *Armstrong World Industries* and of the court's perception that FMC might not have had an "insurable interest," as required and defined in Insurance Code section 280 and following sections, in these sites.

FMC made similar concessions, and the trial court ruled similarly, as to four "category A" sites—J.I.S. Landfill, Kin-Buc Landfill, and Higgins Farm, in New Jersey, and Mountaineer Refinery, in Wyoming—assigned to the eighth trial.

On their first cross-appeal the London defendants challenge the trial court's ruling as to the Andover site. By its fourth, seventh and eighth appeals FMC, having reconsidered the applicability of *Armstrong World Industries,* challenges the rulings denying coverage as to the "category A" and "category B" sites assigned to those trials.

The crux of FMC's argument is that the London policies' definition of an "occurrence" was unambiguous as to what must occur during a policy period, requiring in pertinent part only unexpected or unintended "property damage" without reference to any requirement that FMC have caused, or otherwise have been contemporaneously liable for, the "property damage," and that it is undisputed that there was in fact "property damage" sufficient to constitute a continuous injury trigger under *Montrose II.*

The London defendants' primary position is that this case is controlled by *A. C. Label,* in which a majority of this court's panel held, on "category B"

facts and under general liability policy language similar in substance to that of the London policies, that "[t]he coverage provided by [the general liability] policy was not triggered during the policy period because plaintiffs had no connection to or nexus with the damage caused by contamination that occurred on the subsequently acquired property during the policy period." (48 Cal.App.4th at p. 1194.)

FMC respectfully suggests that this court decided *A. C. Label* incorrectly. In essence FMC agrees with the dissent in *A. C. Label* that "the clauses are the same standard clauses that were at issue in *Montrose [II]* . . . . The court therein settled the meaning of the clauses: 'We find no ambiguity in this language; it clearly and explicitly provides that the occurrence of bodily injury or property damage during the policy period is the operative event that triggers coverage.' ([10 Cal.4th] at p. 668.) [¶] . . . Since there is no question that there was an occurrence during the policy period in this case, the policy affords plaintiff coverage." (*A. C. Label Co.* v. *Transamerica Ins. Co., supra*, 48 Cal.App.4th at pp. 1195-1196 (dis. opn. of Premo, Acting P. J.).)

FMC argues that *A. C. Label* was flawed by its asserted failure to acknowledge that "[t]he Supreme Court has held that statutorily created, retroactive, strict liability is covered under general liability policies. As long as the necessary triggering event (*i.e.*, injury or damage) takes place during the policy period and the insured is held liable for that injury or damage, coverage exists under occurrence-based CGL policies."

FMC's reference is to the following footnote, in the Supreme Court's opinion in *AIU Ins. Co.* v. *Superior Court, supra*, 51 Cal.3d 807, in support of a text generalization that ". . . we generally interpret the coverage clauses of insurance policies broadly, protecting the objectively reasonable expectations of the insured": "Although our focus is the expectations of the insured at the time the policy is made, this emphasis does not preclude coverage of forms of liability—such as those at issue here—created after the formation of the policy. Because the policies in question here are 'comprehensive,' it was within the insured's reasonable expectation that new types of statutory liability would be covered, as long as they were within the ambit of the language used in the coverage provision. As one court has pointed out, failure to cover new liabilities would create a 'discordant result, for it would mean that where courts enlarge liability during the effective period of a liability policy, an insured who contracted for complete coverage of a possible risk would be left without coverage because the scope of the risk had been enlarged by decisional law.' [Citation.] The same is true when legislatures create entirely new forms of liability. The sole relevant inquiry

in determining whether such types of liability are covered is whether, in view of the reasonable expectations of the insured, policy language can be interpreted to embrace the liability that may accrue under new statutory schemes." (51 Cal.3d at p. 822, fn. 8; cf. also *Armstrong World Industries, Inc.* v. *Aetna Casualty & Surety Co., supra,* 45 Cal.App.4th at p. 59, fn. 23; *Cooper Companies* v. *Transcontinental Ins. Co., supra,* 31 Cal.App.4th at p. 1107, fn. 10; *Travelers Ins. Co.* v. *Industrial Indem. Co.* (1971) 18 Cal.App.3d 628, 632 [96 Cal.Rptr. 191]; *Pacific Indemnity Co.* v. *Liberty Mutual Ins. Co.* (1966) 239 Cal.App.2d 346, 352 [48 Cal.Rptr. 667].)

We understand the Supreme Court to have referred to the well-established rule that liability insurance coverage will extend to liabilities created or enlarged by post–policy period changes in applicable *law.* We do not understand the parties to disagree with this principle, which is applicable in this case inasmuch as CERCLA (for example) was not enacted until 1980, 10 years after the last London policy period relevant to the issues before us. In no case would, or could, FMC have been declared liable under CERCLA *at the time damage occurred within the policy period,* because at that time CERCLA did not exist. FMC subsequently *became* liable, by virtue of CERCLA, for damage which had occurred within policy periods several years before.

But in every instance, other than at Andover, in which the trial court found coverage under the London policies, it was also true that every *factual* predicate for CERCLA liability, including a nexus between FMC and the damage or the site, could be shown to have existed *before or during the policy period.*

We consider such a showing of a contemporaneous factual predicate essential to the kind of coverage for statutorily expanded risk to which *AIU*'s footnote referred. For this reason we shall conclude, as we concluded in *A. C. Label,* that coverage for liability under subsequently enacted statutes was not triggered in policy periods in which a sufficient factual nexus could not be shown.

Our conclusion that a complete factual predicate for a liability subsequently imposed by law must exist during the policy period is based in our perception that while it is indeed appropriate to require that an insurer that writes, and accepts a substantial premium for, general liability insurance assume the risk of expansion in *legal theories* of liability applicable to facts which occurred in or before the policy period, it is neither reasonable nor consonant with the terms of the general liability policies before us to require such insurers to cover liabilities based on *facts* which did not occur until

after the policy period. A general liability insurer can realistically be said to be in the business of understanding and taking into account the legislative and judicial dynamics that produce changes in legal theories, but cannot be required to be clairvoyant as to the infinite possible future permutations of facts, fundamental to the very existence of coverage but not in existence during the policy period, once the policy period has expired.

FMC argues that such a conclusion would essentially rewrite the policies in light of judicial concepts of fairness and justice, in violation of the Supreme Court's recent admonition, in *Aerojet-General Corp.* v. *Transport Indemnity Co.* (1997) 17 Cal.4th 38 [70 Cal.Rptr.2d 118, 948 P.2d 909], that the insurance policies before the court in that case "provide what they provide," and that in agreeing to the policies the parties "established what was 'fair' and 'just' inter se. We may not rewrite what they themselves wrote. . . . As a general matter at least, we do not add to, take away from, or otherwise modify a contract for 'public policy considerations.' " (17 Cal.4th at p. 75.)

We disagree with FMC's restrictive reading of the Supreme Court's language in *Aerojet. Aerojet* itself furnishes vivid evidence that its admonition that insurance policies "provide what they provide" is applicable only "[a]s a general matter" and by no means inflexibly. In *Buss* v. *Superior Court* (1997) 16 Cal.4th 35 [65 Cal.Rptr.2d 366, 939 P.2d 766], the Supreme Court had revalidated the duty of an insurer whose policy contains a duty to defend to undertake the entire defense of a "mixed" action involving both potentially covered claims and claims which were not potentially covered. The Supreme Court explicitly acknowledged that "[w]e cannot justify the insurer's duty to defend the entire 'mixed' action contractually, as an obligation arising out of the policy, and have never even attempted to do so. . . . [¶] That being said, we can, and do, justify the insurer's duty to defend the entire 'mixed' action prophylactically, as an obligation imposed by law in support of the policy." (16 Cal.4th at pp. 48-49, fn. omitted.) In *Aerojet* the Supreme Court reaffirmed both this rule and its rationale. Patently the Supreme Court did not regard the duty to defend "mixed" actions as one to which policies should be deemed to "provide what they provide."

We believe the issue before us is perhaps comparable in significance to that of the duty to defend "mixed" actions. Certainly the problem goes beyond mere generalization as to what might be considered "fair" or "just." It is fundamental to the concept of liability insurance. We are satisfied that we have reached a valid resolution.

The London defendants also reassert the trial court's apparent conclusion that, for want of a sufficient nexus, FMC did not have the "insurable

interest" required by Insurance Code section 280 and following sections in the sites in "category·A" and "category B." We have concerns about the relevance of *property* interests to the concept of insurable interest in the context of *liability* insurance (cf., e.g., *Osborne* v. *Security Ins. Co.* (1957) 155 Cal.App.2d 201, 205 [318 P.2d 94]; *Davis* v. *California Highway Indem. Exch.* (1931) 118 Cal.App. 403, 406 [5 P.2d 447]), but in light of the conclusion we have stated we need not resolve the question in this action.

Our conclusion requires that the judgment be modified to reflect no coverage under the London policies, for any of their policy periods, at the Andover, Minnesota site.

### *"Unexpectedly"*

Under the London policies' definition of "occurrence," FMC could establish coverage only if the property damage for which it was liable had occurred "unexpectedly and unintentionally." The parties appear to have agreed, and early in the proceedings the trial court ruled, that "unintentionally" was not in issue. But the question whether environmental harm had in any particular instance been *unexpected* from FMC's standpoint pervaded the proceedings. Shortly before the first trial, the Court of Appeal, First Appellate District held that "[t]he appropriate test for 'expected' damage is whether the insured knew·or believed its conduct was substantially certain or highly likely to result in that kind of damage." (*Shell Oil Co.* v. *Winterthur Swiss Ins. Co., supra,* 12 Cal.App.4th at p. 748.) The trial court applied this subjective test throughout these proceedings.

### 1. *Burden of Proof as to "Unexpectedly"*

 Would FMC be required to prove that the property damage had been unexpected? Or would the insurers be required to prove that the property damage had *not* been unexpected? The trial court concluded that the burden of proving the property damage was unexpected should be borne by FMC, as the insured, and it instructed the juries accordingly at each of the eight trials.

The juries reached the "unexpectedly" issue with respect to a total of 19 sites, and concluded that the property damage had *not* been unexpected (and thus, in necessary effect, that FMC had not borne the burden assigned to it by the trial court) at 7 of these sites. On the basis of the juries' findings, the trial court denied coverage at each of these seven sites. On appeal, FMC argues that it should not have been required to bear the burden of proof as to this issue, and that the trial court's error manifestly prejudiced it with respect

to five of the seven sites. FMC does not raise the issue as to the Julian Street site involved in the third trial or the Mouat site in the fifth trial.

FMC argues, essentially in the alternative, (a) that the "unexpectedly and unintentionally" language of the policies' "occurrence" definition was in essence an *exclusion* from coverage as to which, under the general rule, the insurer should bear the burden of proof, and (b) that to place the burden on FMC would be to require FMC to implicate itself, in violation of Evidence Code section 520, in the commission of "wrongdoing." We disagree with both branches of FMC's argument and shall validate the trial court's ruling and instructions.

a. *Exclusion From Coverage*

Each of the London umbrella policies, like standard form CGL policies, contained an insuring agreement followed by separately stated exclusions. The Supreme Court has recently restated the approach courts must take to coverage questions under such policies: "[T]he insuring agreement . . . states the risk or risks covered by the policy, and the exclusion clauses . . . remove coverage for risks that would otherwise fall within the insuring clause. [Citation.] Before 'even considering exclusions, a court must examine the coverage provisions to determine whether a claim falls within [the policy terms].' [Citation.] 'This is significant for two reasons. First, ". . . when an occurrence is clearly not included within the coverage afforded by the insuring clause, it need not also be specifically excluded." ' [Citation.]

" 'Second, although exclusions are construed narrowly and must be proven by the insurer, the burden is on the insured to bring the claim within the basic scope of coverage, and (unlike exclusions) courts will not indulge in a forced construction of the policy's insuring clause to bring a claim within the policy's coverage.' [Citation.] Accordingly, the insured has the burden of showing that there has been an 'occurrence' within the terms of the policy." (*Waller* v. *Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 16 [44 Cal.Rptr.2d 370, 900 P.2d 619]; cf. also *Collin* v. *American Empire Ins. Co.* (1994) 21 Cal.App.4th 787, 802-803 [26 Cal.Rptr.2d 391]; *Hallmark Ins. Co.* v. *Superior Court* (1988) 201 Cal.App.3d 1014, 1017 [247 Cal.Rptr. 638].)

Once the insured has borne the burden of bringing the claim within the basic scope of coverage, "[t]he burden then shifts to the insurer to prove the claim falls within an exclusion." (*Merced Mutual Ins. Co.* v. *Mendez* (1989) 213 Cal.App.3d 41, 47 [261 Cal.Rptr. 273]; cf. also *Royal Globe Ins. Co.* v. *Whitaker* (1986) 181 Cal.App.3d 532, 537 [226 Cal.Rptr. 435]; *Executive Aviation, Inc.* v. *National Ins. Underwriters* (1971) 16 Cal.App.3d 799, 806 [94 Cal.Rptr. 347].)

The London policies' "occurrence" definition is manifestly an inseparable element of the policies' insuring agreements, which state the London defendants' obligations in terms (among others) of "occurrence." On the face of the policies, and under the stated rules, the burden would be upon FMC initially to prove that its claim was based on facts which came within the policy definition of "occurrence," including the definition's requirement that property damage resulted "unexpectedly."

To sustain its argument, to the contrary, that the "unexpectedly . . . results in . . . property damage" clause of the "occurrence" definition was the functional equivalent of a policy exclusion as to which the London defendants should bear the burden of proof, FMC relies primarily on *United Pacific Ins. Co.* v. *McGuire Co.* (1991) 229 Cal.App.3d 1560 [281 Cal.Rptr. 375]. *United Pacific* did not involve allocation of the burden of proof. The issue, raised on appeal from a summary judgment, was whether a CGL insurer owed a duty to defend a wrongful termination action under an " 'Extended Definition of Occurrence' " as " 'an accident, an event or a continuous or repeated exposure to conditions which results, during the policy period, in *bodily injury* or *property damage* neither expected nor intended by the insured.' " (229 Cal.App.3d at p. 1563.) Earlier cases had held, in essence, that wrongful termination could not be regarded as an "accident," but the *United Pacific* court perceived that the word "event" "obviously embraces intentional conduct" (*id.* at p. 1565); the dispositive issue was whether the phrase "neither expected nor intended" should be construed to qualify the word "event" (so as to limit coverage to *events* that were neither expected nor intended) or, instead, the words "bodily injury or property damage" (so as to permit coverage of even intentional *conduct* so long as particular resultant *harm* was not expected or intended). Focusing on construction of the phrase "neither expected nor intended," the *United Pacific* court said: "Since the word 'event' is not limited to fortuitous happenings, the phrase 'not expected or intended' [*sic*] cannot be read as language confirming the meaning of the term; in the context of the extended definition, the phrase must be regarded as language of limitation, narrowing the coverage otherwise provided by the word 'event.' As a provision limiting coverage, the phrase performs precisely the same function as the common exclusion for intentional conduct. It does not matter that the phrase appears in the 'definitions' section of the policy rather than the 'exclusions' section; in either case it performs the function of an exclusion. Consequently . . . the phrase is subject to the 'well settled principle that such exclusionary clauses should be interpreted as narrowly as possible.' " (229 Cal.App.3d at p. 1565.)

Construing the phrase narrowly, the *United Pacific* court concluded that the phrase limited only the scope of covered *harms*, and that (inferably

because there was potential coverage for the arguably unexpected and unintended mental and emotional distress damages the discharged employee sought) the insurer had owed a duty to defend.

In our view *United Pacific*'s construction of the phrase in the policy before it, for purposes of invoking a rule of policy interpretation, does not resolve the burden of proof issue with respect to the syntactically distinguishable "occurrence" definition before us. Nor are we bound by the findings and conclusions of a federal trial judge, apparently based in part on the testimony of expert witnesses, that the phrase "neither expected no[r] intended" in a standard form CGL policy's "occurrence" definition was an "exclusion of coverage" as to which the insurer would bear the burden under California law. (*Clemco Industries* v. *Commercial Union Ins. Co.* (N.D.Cal. 1987) 665 F.Supp. 816, 820-821.) California courts that have chosen to address the burden of proof issue, in cases in which the issue appears not to have been directly raised, have not reached consistent results. (Compare, e.g., *Waller* v. *Truck Ins. Exchange, Inc.*, *supra*, 11 Cal.4th at p. 20 [regarding duty to defend, "insured must show . . . neither expected nor intended"] with *Armstrong World Industries, Inc.* v. *Aetna Casualty & Surety Co.*, *supra*, 45 Cal.App.4th at p. 77 ["insurer's burden was to prove . . . that [insured] actually did expect . . ."].) Cases from other jurisdictions are similarly divided. (Compare *Clemco Industries* v. *Commercial Union Ins. Co.*, with *Queen City Farms* v. *Central Nat. Ins. Co.* (1994) 126 Wn.2d 50 [882 P.2d 703] [burden is on insured].)

After consideration of these authorities, we adhere to our conclusion that the phrase "unexpectedly and unintentionally" is an integral part of the "occurrence" definition before us in this case, and thus is subject to the rule assigning the burden of proof of coverage to the insured. Our conclusion is reinforced by the persuasive insights of the Washington Supreme Court in *Queen City Farms* v. *Central Nat. Ins. Co.*, on this issue: "[T]he argument that the 'unexpected or unintended' language is exclusionary is not a particularly strong argument when deciding who has the burden of proof on this issue, because 'virtually all the language in the Insuring Agreement of CGL policies after the insurer's promise to "pay all sums the insured shall become legally obligated to pay . . ." qualifies or limits the scope of this promise in one way or another.' K. Abraham, *Environmental Liability Insurance Law* 140-41 (1991). [¶] . . . [¶] Professor Abraham suggests other considerations, including the notion that the burden of proof should be on the insured because the insured is 'likely to be in possession of or have greater access to whatever information exists about its expectations or intentions . . . .' K. Abraham, at 140. This reasoning is compelling in the case where a subjective standard is applied." (126 Wn.2d at pp. 556-557 [882 P.2d at pp.

715-716].) These observations are germane under California law (cf. 1 Witkin, Cal. Evidence (3d ed. 1986) Burden of Proof and Presumptions, § 136, p. 119 et seq.) and to the analogous language of the London defendants' general liability insurance policies.

### b. *Evidence Code Section 520*

Evidence Code section 520 provides that "[t]he party claiming that a person is guilty of crime or wrongdoing has the burden of proof on that issue."

FMC did not invoke Evidence Code section 520 in the trial court, where the section's application to particular circumstances might have been assessed in light of those circumstances. In this court, to bring the "unexpectedly" element of the London policies' "occurrence" definition within section 520, FMC is obliged to establish, essentially as an abstract generalization, that proof that property damage caused by its releases of toxic contaminants was not unexpected from its standpoint would be tantamount to proof that it was "guilty of crime or wrongdoing."

For this purpose FMC relies on the subjective test for "expected" damage enunciated in *Shell* and applied for other purposes at the trials of this action: "whether the insured knew or believed its conduct was substantially certain or highly likely to result in that kind of damage." (*Shell Oil Co.* v. *Winterthur Swiss Ins. Co.*, *supra*, 12 Cal.App.4th at p. 748.) FMC asks us to conclude that conduct that met the *Shell* test, in the factual context of this action, would necessarily amount at least to "wrongdoing" within the meaning of Evidence Code section 520.

We cannot so conclude. The wording, history and prior judicial application of Evidence Code section 520 all support a finding that "wrongdoing" connotes an element of moral disapprobation substantially greater than that which might be implied by the *Shell* test. Thus (to take as examples two cases FMC has cited) in *Clemmer* v. *Hartford Insurance Co.* (1978) 22 Cal.3d 865, 880 [151 Cal.Rptr. 285, 587 P.2d 1098], it was deemed "consistent with . . . section 520" to require an insurer to show that its insured had acted wilfully (within the meaning of Insurance Code section 533) in shooting his employer to death, and in *Fisher* v. *Superior Court* (1980) 103 Cal.App.3d 434, 448-449 [163 Cal.Rptr. 47], the Court of Appeal referred to section 520 in apparent support of its conclusion that the burden of proof as to the "good faith" of a settlement should be upon the party who asserted the settlement was *not* made in good faith, i.e., was made in bad faith. We find no comparable connotation compelled in the context of liability, under

essentially regulatory statutes, for toxic contamination by reason of acts in many instances done long before the statutes were enacted.

### 2. *Separate Sources of Damage*

FMC occasionally perceived that it might be unable to prove that certain of the third party property damage at or attributable to a site had been unexpected. One tactical response to such a perception was to argue that such damage could be isolated from other third party property damage at or attributable to the site, and that FMC should be permitted to prove that the other damage, viewed in isolation, had been unexpected and thus to obtain coverage at least for its liability for the other damage. Under the policy language such an argument was necessarily addressed to, and phrased in terms of, the policy definition of "occurrence."

A site might (for example) have had two sources of pollutants, each of which had contributed to groundwater contamination, and while FMC could hope to prove that it had not expected *one* of the sources to cause the damage it could not reasonably expect to prove that the damage caused by the *other* source was unexpected. If the totality of damage attributable to the two sources were considered a single occurrence, then FMC's inability to establish the "unexpectedly" element as to one of the sources would jeopardize its prospects for coverage as to either source. If, on the other hand, FMC could establish that each source should be treated as the basis of a separate occurrence, then it might be able to show that damage was unexpected as to one source, and thus preserve coverage for its liability for damage attributable to that source, even though it could not make a similar showing as to the other source.

█ Under California case law, for the purpose of determining the number of occurrences under a liability insurance policy (usually as a means of calculating policy limits) "occurrence has generally been held to mean the underlying cause of the injury, rather than the injury or claim itself . . . ." (*Whittaker Corp.* v. *Allianz Underwriters, Inc.* (1992) 11 Cal.App.4th 1236, 1242 [14 Cal.Rptr.2d 659].)

The London umbrella policies addressed the determination of the number of occurrences only in the provision, appended to the "occurrence" definition, that "[a]ll such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence." In standard form policies this provision has been referred to as a "one occurrence clause." (Cf. *Endicott Johnson Corp.* v. *Liberty Mut. Ins. Co.* (N.D.N.Y. 1996) 928 F.Supp. 176, 179.)

Before the first trial in this action the trial court filed a written ruling that in essence made both the case law rule and the one occurrence clause applicable to these trials without undertaking to synthesize the two. The appropriate synthesis is apparent: The one occurrence clause would qualify the case law rule in any case to which the one occurrence clause would be applicable, so that more than one occurrence could be found on the basis of separately identifiable causes of property damage unless the property damage had been caused by an exposure to "substantially the same general conditions existing at or emanating from one premises location."

In the proceedings that led to this ruling, counsel for FMC acknowledged "the general proposition that there is one occurrence per site, unless there [are] peculiar facts under this language where there would be more than one."

One of the sites assigned to the third trial, the Green River site in Wyoming, potentially raised a problem similar to that illustrated by our example: There were at least two separately identifiable sources of contamination on the site, and the likelihood of contamination arguably was more apparent at one source than at another. The third trial jury was given a definition of "occurrence" but was neither instructed as to multiple occurrences nor given the option on the special verdict form of making separate findings as to the separate sources on the Green River site. By their questions to the court during their deliberation, in November 1995, the jurors made clear that they had focused on and were concerned by the distinctions between the two sources. The trial court responded by referring the jury to the instructions already given, but then added the one occurrence clause: "As to property damage resulting from a continuous or repeated exposure to conditions, you are now further instructed that all such exposure to substantially the same general conditions existing or emanating from the Green River site shall be deemed one occurrence." The court did not alter the special verdict form. The jury ultimately found that there had been third party property damage at the Green River site and that the damage had been unexpected, and the trial court found coverage under the London policies for the Green River site as a whole.

The multiple-source problem arose again at the Carteret site in New Jersey (assigned to the fourth trial) and at the Pocatello site in Idaho (assigned to the fifth trial), but in these instances FMC did not obtain an adjudication of coverage. On appeal FMC complains of trial court rulings which effectively denied FMC an opportunity to argue, as to the Carteret and Pocatello sites, that the jury could consider the "unexpectedly" issue separately as to sources where FMC believed it had better prospects for coverage.

a. *Carteret*

At Carteret, groundwater contamination was traced to two sources on the site: a sand-lined "dewatering pit" which was identified as a source of arsenic contamination, and a concrete storage tank known as the "P-4 pit" which was identified as a source of contamination by phosphorus and phosphates. It was apparent from the evidence at the fourth trial that the jury could have concluded that FMC was more likely to have expected contamination from the dewatering pit than from the P-4 pit.

Proposed jury instructions and special verdict forms for the fourth trial had been due, under the trial court's elaborate case management orders, on January 2, 1996, shortly after the jury questions and verdicts at the third trial. Possibly sensing how close it had come to an all-or-nothing disaster as to the Green River site, FMC submitted a proposed special verdict form that would have called for separate findings as to the dewatering pit and the P-4 pit at the Carteret site. But FMC did not at that time request any instruction on multiple occurrences, or otherwise in support of its proposal for separate verdicts for the two Carteret sources; FMC did request a general definition of "occurrence" which tracked the London policies' definition (but without the one occurrence clause).

On February 20, 1996, after approximately four weeks of FMC's five-week case-in-chief at the fourth trial, FMC submitted "proposed additional and revised jury instructions" which included two new requested instructions germane to the issue before us:

"Instruction No. 33" would have added the one occurrence clause to FMC's previously requested "occurrence" definition.

"Instruction No. 33A" would have told the jury that "[m]ore than one 'occurrence' may exist at a site for coverage purposes. The number of occurrences is determined by the number of cause(s) of the property damage. · You must decide whether particular acts, practices, or activities at a particular site location are so unrelated as to support a finding of more than one occurrence at a site."

At a hearing three days later, on February 23, the trial court questioned counsel for FMC concerning the proposed instructions: "Now we are talking about multiple occurrences, or multiple something? [¶] [Counsel for FMC]: Sources. [¶] . . . . [¶] Or causes for the same injury." Counsel told the court she was requesting the instruction "because the burden of proof being on the plaintiff, we think we need to address it on a source-by-source basis."

It was not until March 13, after both sides had rested and shortly before summations, that counsel for FMC explicitly stated that "we believe that the exposure from the P-4 pit could be considered a different issue, and it is, in fact, a different occurrence from the exposure relating to the dewatering pit." Counsel rationalized FMC's position in terms of perceived "fundamental differences" between the dewatering pit and the P-4 pit.

After further argument on March 13, the trial court refused both "Instruction No. 33" and "Instruction No. 33A." Apparently the court's only reservation as to "Instruction No. 33" was that it had been submitted solely to lend context to "Instruction No. 33A," but the court was not prepared to give "Instruction No. 33A" in any event: "From the plaintiff's argument, it sounds arguable that they could have made a case for two occurrences, but I find that they did not. Cannot try a case in a vacuum, it has not been noticed, it comes too late, so the issue has been deemed waived. [¶] . . . [¶] . . . The instruction that plaintiff seeks . . . is that there are two occurrences, or can be two occurrences at Carteret. There is no such instruction, it comes too late, comes about 8 weeks too late."

In its instructions to the fourth trial jury, the trial court neither defined nor otherwise explained "occurrence," and instructed the jury generally, as to Carteret and other sites assigned to the fourth trial, that it would be incumbent upon FMC to prove that "third party property damage at the site" was "unexpected by the plaintiff." With respect to the Carteret site the jury found that there had been third party property damage but that the damage had not been unexpected. On the basis of these special verdicts the trial court concluded that FMC was not entitled to coverage at the Carteret site.

On appeal FMC argues that refusal of its proposed "Instruction No. 33A" was error, and, in support of its assertion that the error was prejudicial, explicitly asserts (apparently for the first time) that "[i]f instructed on multiple occurrences, the jury might have found there was coverage for FMC's environmental liability arising from the P-4 pit even if its determination that FMC 'expected' the dewatering pit would pollute was proper." As to the timeliness of its request, FMC argues that it had effectively disclosed its intention to pursue a multiple occurrence theory by its proposed special verdict form filed January 2 and by its "Instruction No. 33A" filed February 20, that its February 20 request was timely in light of Code of Civil Procedure section 607a (which permits "additional proposed instructions" in specified circumstances), *Ng* v. *Hudson* (1977) 75 Cal.App.3d 250, 259 [142 Cal.Rptr. 69], and *Kirkpatrick* v. *Damianakes* (1936) 15 Cal.App.2d 446, 451 [59 P.2d 556], notwithstanding the trial court's case management orders, and that counsel's remarks on February 23 had not amounted to a denial that

FMC intended to rely on its assertedly previously disclosed multiple occurrence theory.

Whatever the propriety of FMC's position on the merits of its multiple occurrence theory, we find FMC's timeliness arguments unpersuasive.

Throughout these proceedings the trial court had properly sought to maintain tight control over the parties' zealous advocacy of often diametrically opposed views as to numerous complex issues. The court insisted that (among several other things) counsel make prompt and complete disclosure of facts and legal theories to the end that, in the court's often repeated phrase, the parties' "cards" be "on the table face up."

The January 2 deadline for submission of proposed instructions and verdict forms for the fourth trial had been set months earlier, before the third trial. Counsel for FMC acknowledged at hearing that FMC had sought to exploit a multiple occurrence theory at the third trial; necessarily FMC was familiar with the theory well in advance of the January 2 deadline. Carteret was owned by FMC and had been for more than 30 years; it cannot be disputed that the analogies between the asserted multiple sources at Carteret and (for example) the Green River site would have been obvious to FMC long before January 2. A fortiori FMC should have understood not only the potential for asserting a multiple occurrence theory as to Carteret but also the potential significance of such an assertion when it submitted its otherwise unexplained special verdict form on January 2 and additional requested instructions on February 20. FMC's assertion that on February 23 counsel "simply clarified that its multiple occurrence theory was based on the existence of multiple sources of pollution" is inconsistent with the record from which we have quoted. Code of Civil Procedure section 607a's authorization to submit additional proposed instructions during trial extends (in pertinent part) to "questions of law developed by the evidence and not disclosed by the pleadings." Whether or not FMC's multiple occurrence theory might be said to have been "disclosed by the pleadings," it is clear to us that there was no need whatsoever for FMC to have depended on trial evidence to disclose the potential availability of the theory. Both *Ng* and *Kirkpatrick* are factually distinguishable.

The trial court's conclusion that FMC had waited too long to make a full and candid disclosure of its multiple occurrence theory was supported by the record and well within the scope of the court's inherent power to control the proceedings before it. (Cf. Code Civ. Proc., § 128; *Cottle* v. *Superior Court* (1992) 3 Cal.App.4th 1367, 1376-1379 [5 Cal.Rptr.2d 882].) There was no error.

b. *Pocatello*

Sources of pollution at FMC's 1,500-acre Pocatello could be divided into 2 general categories: those which contaminated the groundwater by seepage from unlined ponds, and those which created airborne emissions leading to off-site surface damage. ▮ Before the fifth trial, FMC abandoned its claim for coverage for its air emissions. But throughout the proceedings FMC undertook (1) to distinguish a source of groundwater contamination of which it admittedly was aware from several sources of assertedly unexpected groundwater contamination, and (2) to seek coverage only as to the assertedly unexpected contamination.

FMC's approach at Pocatello was distinct from its belatedly implemented tactic at Carteret: At Carteret, FMC had undertaken to show that there had been *two* occurrences and to ask the jury to make a separate finding on the "unexpectedly" issue as to each occurrence. At Pocatello FMC took the position that there was only *one* relevant occurrence, but that the occurrence included only the three sources (the "slurry/evaporation ponds," "slag pit and slag pit sump," and "railroad swale") as to which FMC expected to be able to prove the resulting damage had been unexpected, and excluded the source (the "kiln ponds") at which FMC had been aware of groundwater contamination before 1964. In support of its position FMC argued that the kiln ponds were factually distinguishable from other sites.

On the premise that FMC could not prove the kiln ponds contamination had been unexpected, the London defendants moved to exclude *all* evidence that groundwater property damage at Pocatello was unexpected. The London defendants argued that the "occurrence" at Pocatello included the releases from the kiln pond, and therefore if FMC could not prove the kiln ponds contamination was unexpected its expectations as to other Pocatello sources was irrelevant. They argued that all groundwater contamination sources at the site "are part of the same substantially similar exposure to the same general conditions. . . . In lay terms, the groundwater problem is the result of leaky ponds. In terms of the policy language, the exposure to the same general conditions is the seepage of materials into the groundwater."

The London defendants pointed out that in FMC's pretrial offer of proof submitted several months earlier, in a detailed report by one of FMC's expert witnesses submitted as part of the offer of proof, in the expert witness's deposition answers given at the time the London motions were being made, and in FMC's answers to certain interrogatories, neither FMC nor its witnesses had sought to distinguish among the various sources of groundwater contamination. In its offer of proof FMC had in fact listed the

kiln ponds with the slurry/evaporation ponds in a single undifferentiated category for purposes of physical analysis.

The trial court granted the London defendants' motion, concluding that "[t]here is only one groundwater contamination occurrence at the site as a matter of law, because the evidence is undisputed that the property damage for which plaintiff is liable at Pocatello resulted from exposure to substantially the same general conditions at the site" and that the admissions implicit in FMC's various pretrial statements had amounted to "a judicial admission that cannot be contradicted by contrary evidence . . . ."

It was apparent, in light of FMC's awareness of contamination from the kiln ponds, that the trial court's ruling would defeat FMC's claim for coverage at Pocatello. Ostensibly to make a clear record, FMC stated its best Pocatello case one last time in the form of a "combined written opening statement and offer of proof" placed in the court's file two days before opening statements at the fifth trial. FMC's document contained citation and discussion of judicial decisions in support of what can fairly be characterized as argument, and the trial court "rejected" the entire filing as an untimely attempt to reargue, or to obtain reconsideration of the court's ruling on, the previous motions.

Counsel for FMC then made no mention of the Pocatello site in his opening statement, and on this ground the trial court granted the London defendants' motion for nonsuit on opening statement as to the Pocatello site.

On appeal FMC argues (1) that by its reference to FMC's expert reports, and its deposition and interrogatory answers, the trial court had improperly allowed the London defendants to misuse motions *in limine* to limit FMC's evidence to that developed during pretrial discovery, (2) that determination of the number of occurrences at Pocatello, and particularly the issue whether separate sources of contamination could be regarded as "substantially the same general conditions" within the meaning of the one occurrence clause, were questions of fact as to which FMC should have been permitted to go to the jury, and (3) that the phrase "one premises location" in the one occurrence clause is ambiguous and could mean distinct areas within a single site.

In apparent support of its first point FMC also asserts that the trial court improperly treated the London defendants' pretrial motions as in essence motions for summary adjudication, although the motions did not meet procedural requirements for summary adjudication. We need not address this assertion because FMC unquestionably waived it in the trial court when FMC characterized the London defendants' motion to exclude evidence as "a

dispositive motion" which "was not filed by the dispositive motion deadline," but then stated that "we will answer the motion without procedural objection, because it raises fundamental issues that should be decided."

We shall reject FMC's three points and conclude that nonsuit was properly granted.

For the point that the London defendants should not have been permitted to use motions *in limine* to limit FMC to positions it had taken in pretrial discovery, FMC relies on *Kelly* v. *New West Federal Savings* (1996) 49 Cal.App.4th 659 [56 Cal.Rptr.2d 803].

In *Kelly* two plaintiffs sought damages for injuries sustained in one of two adjacent elevators, termed the "large" elevator and the "small" elevator. One plaintiff could not remember which elevator had been involved; the other testified at deposition that it had been the "small" elevator. After it developed that provable conditions on the "large" elevator were more consistent with the plaintiffs' theory of liability, the plaintiffs sought further discovery, but the trial court apparently denied the plaintiffs' motion and granted defense motions *in limine* the net effect of which was to preclude evidence that the plaintiffs had been injured in the "large" elevator. The upshot was a judgment of nonsuit for the defense. The Court of Appeal reversed the judgment, concluding in dispositive part that "[i]t is a misuse of a motion *in limine* to attempt to compel a witness or a party to conform his or her trial testimony to a preconceived factual scenario based on testimony given during pretrial discovery." (49 Cal.App.4th at p. 672.)

The case before us is distinguishable from *Kelly*.

The *Kelly* opinion explicitly recognizes that " '[t]he usual purpose of motions *in limine* is to preclude the presentation of evidence deemed inadmissible and prejudicial by the moving party,' " and that when used for this purpose the procedure serves the interests of justice. (49 Cal.App.4th at pp. 669-670.) Manifestly it was for this purpose that the London defendants made the pretrial "motion[s] for court ruling" here.

The theory underlying the London defendants' motions (and the trial court's ultimate ruling) was that evidence that FMC had not expected contamination from sources other than the kiln ponds would be irrelevant, and thus inadmissible, if (as the London defendants contended and the trial court ultimately concluded) it appeared as a matter of law from undisputed facts that all the groundwater sources FMC had enumerated, including the kiln ponds, had given rise to "substantially the same general conditions

existing at or emanating from one premises location" and thus were to be "deemed one occurrence" for all purposes including resolution of the "unexpectedly" issue. The London defendants' references to FMC's offer of proof and discovery responses served simply to substantiate their assertion that the commonality among the groundwater contamination sources on the site was in fact undisputed. FMC's response to the London defendants' motions raised no new dispute as to what had long been essentially undisputed facts, but simply sought to challenge the London defendants' position as to the legal characterization to be given to those facts. FMC's subsequent elaborate "offer of proof," submitted as trial began, was both belated and inappropriately combined with legal argument and was properly rejected.

FMC's second point necessarily assumes, incorrectly in our view, that there were disputed issues of fact for a jury to resolve. Because the facts were essentially undisputed, it was the office of the court to determine, as a matter of law, whether and how the language of the London policies, and more specifically the one occurrence clause, applied to those undisputed facts. (Cf., e.g., *Century Transit Systems, Inc.* v. *American Empire Surplus Lines Ins. Co.* (1996) 42 Cal.App.4th 121, 125 [49 Cal.Rptr.2d 567]; *California Shoppers, Inc.* v. *Royal Globe Ins. Co.* (1985) 175 Cal.App.3d 1, 35 [221 Cal.Rptr. 171].)

FMC's third point appears to be that as a matter of law the trial court need not, and that as a matter of fact in this case the court should not, have treated the kiln ponds as part of the same "one premises location" with the slurry/evaporation ponds, the slag pit and slag pit sump, and the railway swale for purposes of applying the one occurrence clause. We disagree with FMC. In common parlance the word "premises" refers to defined and utilized real property; the word "location," following "premises" in the policies' syntax, arguably is simply an alternative to "premises" (in which case "premises" should be treated as adjectival, modifying "location" to make clear what sort of "location" was intended) rather than a reference to a smaller part of an entire "premises." But be this as it may, the court's implicit conclusion from essentially undisputed empirical facts that *at the Pocatello site* all four sources were parts of a single "premises location" was consistent with the factual record as well as with the position FMC itself had taken in the course of discovery and trial preparation.

3. *Damage "Greater Than Expected"*

Yet another facet of the "unexpectedly" issue was exposed during proceedings preliminary to the first trial, when the London defendants moved for a ruling "that, if FMC is ultimately shown to have expected or

intended to cause pollution-related damage at any of the six sites at issue [at the first trial], it is immaterial that the damage or injury that occurred was of a different type or nature from that which was expected or intended by FMC." The question thus presented differed from that ultimately litigated at the Carteret and Pocatello sites: Rather than whether *separate sources* of third party property damage could be distinguished, the question was whether a significant distinction could be drawn between *different kinds of damage*, some expected and some unexpected, from a single source or cause.

The London defendants relied principally on *United States Fid. & Guar. Co.* v. *American Employer's Ins. Co.* (1984) 159 Cal.App.3d 277 [205 Cal.Rptr. 460] (*USF&G*), in which an insured under a homeowners policy had intentionally set fire to trash near an outbuilding but the fire had unexpectedly caused considerable additional damage. The liability coverage provisions of the homeowners policy contained an explicit exclusion for " 'bodily injury or property damage which is either expected or intended from the standpoint of the insured' " (159 Cal.App.3d at p. 281, fn. 1), but in seeking to negate coverage for the unexpected consequences of the insured's intentional tort the insurer relied primarily on Insurance Code section 533, which provides in pertinent part that "[a]n insurer is not liable for a loss caused by the wilful act of the insured . . . ." The Court of Appeal affirmed a denial of liability coverage as to all the damage, whether intended or unexpected, under both Insurance Code section 533 and the policy exclusion, holding it "immaterial that [the insured] subjectively did not expect or intend to cause the extent of damage which actually occurred." (159 Cal.App.3d at p. 291.)

In the pretrial proceedings FMC appeared willing to agree that if damage to *third party* property were not shown to have been "unexpected" then there would be no coverage either for that damage or for additional unexpected damage to third party property from the same cause. But the London policies' definition of covered "property damage" did not include damage to property owned by FMC, and FMC argued that the fact FMC expected damage to *owned* property should not bar coverage from additional unexpected damage to *third party* property from the same cause. The London defendants appeared to agree to this qualification, and the trial court undertook to incorporate the parties' positions into what came to be known as its "greater than expected" ruling: "If FMC expected or intended to damage third party property, there is no coverage either for that third party property damage or for any further third party property damage resulting therefrom, even though such further third party property damage exceeded the scope or nature of the expected or intended third party property damage. [¶] . . . If FMC expected or intended to damage its owned property, there is no coverage for FMC's owned property."

At the Fresno site in California, assigned to the first trial, there was a subsite known as the "4.92 acre site" which FMC and its predecessor had owned from 1931 until May 1964, three months before the London defendants first issued policies to FMC. In May 1964 FMC sold the 4.92 acre site to, and then leased it back from, Southern Pacific, and in 1981 FMC repurchased the 4.92 acre site. At all relevant times FMC had dumped insecticide residues on the 4.92 acre site; the residues ultimately percolated into the groundwater. At the first trial the London defendants requested an instruction, directed to the 4.92 acre site, in language similar to that of the first sentence of the "greater than expected" ruling. After review of the "greater than expected" ruling the trial court refused the instruction, implying that it was influenced by perceptions (1) that in all the circumstances the 4.92 acre site should be treated as property owned by FMC rather than as third party property and (2) that "such jumping from the soil condition to the groundwater damage is too big a jump. [¶] And also it takes away from the jury the essential dispute in the case and that is whether or not . . . the plaintiff expected groundwater damage to occur . . . . I consider it would be grave error for me to remove that from the jury." No one sought review of this ruling, but the ruling is discussed on appeals which raise analogous issues with respect to the Mouat site in Montana (assigned to the fifth trial) and the Jacksonville site in Florida and the Malaga site in New Jersey (assigned to the sixth trial).

a. *Ownership of On-site Soil*

At each of the Mouat, Jacksonville and Malaga sites the initial release of pollutants was onto on-site soil, from which the pollutants percolated into the groundwater. A threshold issue at each site was whether the on-site soil was owned by FMC.

The answer was clear at both Mouat and Malaga. FMC owned none of the property at the Mouat site, which it had undertaken to manage for a family business for a period of six months in 1961 and 1962. Thus the soil on the Mouat site was, for coverage purposes, third party property. At Malaga, on the other hand, FMC owned the site and thus its soil, and the jury was instructed that at Malaga the third party property damage as to which it would be required to address the "unexpectedly" issue was confined to groundwater and *off*-site soil.

But an issue as to ownership of the on-site soil was raised at the Jacksonville site. FMC had leased the site from railroad companies from 1946 to 1980, under a lease which required FMC to pay the property taxes and to indemnify the lessor against all claims and costs in connection with

property damage related to FMC's use of the property; FMC ultimately purchased the site from its lessor in October 1980, 10 years after the last of the relevant London policy periods. Thus the situation at Jacksonville was somewhat similar to that at the 4.92 acre site, where the trial court appeared to have concluded that the leased site should be deemed owned by FMC for coverage purposes.

It was to the London defendants' tactical advantage to attempt to establish, notwithstanding the earlier ruling as to the 4.92 acre site, that the soil at Jacksonville was third party property and thus to cast on FMC the relatively heavy burden of proving that damage to the on-site soil had been unexpected. The London defendants sought to do so in proceedings preliminary to the sixth trial.

To this end, in pretrial proceedings London asserted that "[t]he on-site soil at Jacksonville was not owned by FMC." FMC responded that it had "effectively or actually owned the Jacksonville site since 1946; and . . . the on-site soil at Jacksonville should be treated as owned, not third-party, property under London's policies." FMC argued that under the circumstances of record, "where a long-term lessor is[] the functional equivalent of the owner of a site and then purchases that site, the property should be treated as owned property under the insurance policy's coverage provisions."

The trial court ruled, succinctly, that "the property is found as a matter of law to be nonowned. Leased property is not owned property."

On appeal FMC seeks review of this ruling.

First FMC asserts, apparently for the first time on appeal, that the ruling and the subsequent jury instructions had amounted to an "unwarranted expansion of FMC's coverage claim without FMC's consent . . . ." FMC argues that "London cannot create a claim that FMC never asserted—a fictional claim—for the purpose of invoking a policy exclusion that could only apply to the fictional claim . . . . Absent a claim for coverage to a class of property within the scope of the insuring agreement, the question of whether the policy exclusion for 'expected or intended' damage does not and cannot arise."

FMC's argument seeks to import into the definition of "occurrence" a limitation the policy does not impose. Nothing in the policy language empowers the insured, by its characterization of its claim or by any other means, to redefine the "occurrence" on which it bases a coverage claim to exclude those elements of a single coherent "continuous or repeated exposure to conditions which . . . results in . . . property damage" which might

defeat its attempt to prove that the "exposure" and resultant "property damage" were unexpected. Put another way, nothing in the policy language restricts an insurer's power to require its insured to prove all elements of its coverage claim with respect to all elements of the underlying "continuous or repeated exposure to conditions which . . . results in . . . property damage."

FMC's second argument slightly shifts the emphasis of its trial-court assertion that its leasehold during the 1964-1970 policy periods should have been deemed tantamount to ownership. FMC now argues that it is its 1980 purchase of the Jacksonville site that should be dispositive: "[T]he overarching purpose of the policy is to reimburse the insured for liability incurred on account of 'property damage.' [Citing the policy.] It makes more sense to answer the question whether the property is or is not 'owned' at the time the claim is made—at the time London's obligations under the policy are to be performed." Again FMC's argument overtaxes the policy language, which defines property damage in terms which manifestly relate to the time of damage or destruction: "[L]oss of or direct damage to or destruction of tangible property (other than property owned by the Named Insured)." And aside from the plain meaning of the property language, the construction FMC proposes would empower the insured impermissibly to manipulate coverage after the loss.

We find no error in the trial court's conclusion that the soil at the Jacksonville site was third party property at times relevant to coverage. We reiterate that the court's earlier ruling as to the 4.92 acre site is not before us for review.

### b. *"Unexpected" Groundwater Damage*

As to all three sites FMC argues that the trial court improperly foreclosed coverage for assertedly unexpected damage to groundwater in circumstances in which the jury might have found that FMC had expected only damage to soil. We shall conclude that the trial court ruled and instructed correctly with respect to this issue at the Mouat, Jacksonville and Malaga sites.

### i. *Mouat*

At the fifth trial FMC acknowledged that wastes it had discharged to waste piles and ponds on the Mouat site had contaminated both soil and groundwater, and that contamination had persisted into the 1964-1970 policy periods, but tried and argued the case on the theory that it had not *expected*

damage to either the soil or the groundwater during the 1964-1970 policy periods.

In preliminary pretrial proceedings FMC acknowledged that there was only one occurrence, within the meaning of the London policies, at the Mouat site.

But before trial began FMC submitted a proposed special verdict form for the Mouat site that would have called upon the jury to make findings, both as to whether there had been third party property damage and as to whether the damage had been unexpected, *separately* as to soil and as to groundwater. The London defendants immediately sought a protective order to prevent FMC from arguing that it would be "entitled to coverage at the site if it expected soil contamination but not groundwater contamination." In response, FMC again acknowledged that there was only one occurrence at the site, and that it "will state and argue that it did not expect property damage to either the soil or the groundwater during the policy years," but argued that the jury could nevertheless conclude that FMC "did expect soil damage but did not expect groundwater damage," and that upon such findings FMC should be "entitled to coverage for costs incurred in the investigation and remediation of such unexpected groundwater damage including removal or treatment of the source of such damage."

FMC's argument obviously called the "greater than expected" ruling into question; FMC sought to invoke the trial court's first trial ruling concerning the 4.92 acre site. The trial court responded that the 4.92 acre site had presented "a totally different situation," and granted the London defendants' motion in terms of the occurrence concept: "As a matter of law, there are not two occurrences because there are two different kinds of third party property that have been affected. And the plaintiff will be precluded from suggesting that to the jury in any stage of the proceedings. There is a single occurrence and that is the law that will govern this trial." Implicit in the court's ruling was a determination that only a single undifferentiated finding as to the "unexpectedly" element would be required.

In the course of the fifth trial FMC continued to focus on a distinction between expectation of soil damage and expectation of groundwater damage, and requested an instruction that the jury "should consider soil and groundwater separately in determining whether third-party property damage occurred during the insurance policy years and, if so, whether such damage was unexpected by FMC." The London defendants, in turn, requested an instruction, along the lines of the "greater than expected ruling," that (as modified in the course of colloquy) "[i]f FMC expected to damage third-party property at any site, it is immaterial that the resulting third-party

property damage at that site may have been greater than or different from that which FMC believed would occur." The court and counsel referred to this as a "*USF&G* instruction." The trial court refused FMC's instruction and then rejected FMC's proposed verdict form, primarily because now "[t]here is no instruction that would permit this bifurcation."

In further colloquy on the London defendants' "*USF&G* instruction," counsel for FMC appeared to shift position: "We have consistently said . . . and we'll say in closing that we did not expect *soil or* groundwater, and that's the way we've tried the case. . . . [¶] What really is wrong with this U.S.F.& G. instruction is it[]s potential to be misinterpreted, to say if plaintiff knew of damage *in one year*, that means it knew of damage *in another year. That's what is really going on here.* [¶] . . . [¶] . . . [I]f the basis is simply the claim that we are implying that we may have expected soil but not groundwater, *we are not implying that* and that U.S.F.& G. instruction should not be given." (Italics added.)

Counsel for the London defendants responded that he feared FMC would in fact argue the distinction between soil damage and groundwater damage, but the trial court was persuaded by FMC's disavowal: "They are not arguing it now, so I'm not inclined to give U.S.F.& G., because there's no other issue in the case . . . which it addresses." The court encouraged the London defendants "to promptly object if there's any indirect argument or any kind of argument that would trigger this [*USF&G*] instruction."

The court instructed the jury in pertinent part that "[t]o be entitled to a verdict on this claim plaintiff must prove to the jury the existence of each of the following three elements: [¶] One, that there was a continuous or repeated exposure to conditions that caused third-party property damage at each such site; [¶] Two, that such resulting third-party property damage occurred during the policy period; [¶] And three, that such resulting third-party property damage during the policy period was unexpected by the plaintiff. [¶] . . . [¶] Third-party property is to be distinguished from property owned by the plaintiff. [¶] Third-party property is all other property. All not-owned property. [¶] Third-party property includes groundwater."

In summation, counsel for FMC asserted several times that FMC had not expected contamination to soil or to groundwater, but did not assert a dispositive distinction between the two, and in one instance suggested to the jury that "the issue" was "[w]hether they believed they damaged the soil or groundwater underneath *or either one*." (Italics added.)

The jury concluded that the third party property damage at Mouat (left undifferentiated by the court's instructions and counsel's summation) had

not been unexpected, and on that basis the trial court denied coverage for Mouat.

On appeal FMC argues in essence that the combined effect of the trial court's rulings and jury instructions had been (notwithstanding the court's denial of an explicit *"USF&G* instruction") to implement a rule, broadly consistent with the pretrial "greater than expected" ruling, that a showing of *any* third party property damage that FMC could not prove to be unexpected would suffice to bar coverage for FMC's liability for *all* third party property damage from the same cause. FMC asserts that the initial "greater than expected" ruling had misconstrued *USF&G* and was an "erroneous statement of law." FMC argues that "[t]he rule that liability coverage is barred when the insured expected some harm to result from his actions applies only to situations such as arson, or child molestation, where the insured's actions are 'inherently harmful' as a matter of law. Where the insured's actions are not *per se* injurious, it is a question of fact for the jury as to whether any particular type of harm was in fact 'expected' by FMC." Ipso facto (FMC argues) the trial court's ruling and instructions were also erroneous.

FMC's argument to this court is not consistent with the posture it assumed at the fifth trial once the trial court had rejected its proposed instruction and verdict form, but we elect to treat that posture as a tactical response to the court's rulings rather than as a waiver of FMC's objections to them.

FMC's characterization of the practical effect of the trial court's rulings is plausible: The trial court essentially told the jury that if it found that property damage to *any* third party property had not been unexpected, then it could not find that "third-party property damage" (as an undifferentiated concept) had been unexpected. This was, at least as a practical matter, tantamount to a "greater than expected" instruction.

The dispositive question is whether the rule implicit in the trial court's ruling and instructions (whether or not the rule exactly reflects the "greater than expected" ruling) is a valid construction of the London policies under California law.

*USF&G* itself does not provide a dispositive answer. The Court of Appeal referred primarily to Insurance Code section 533, and addressed the policy's "expected or intended" exclusion only by way of what was at most an alternative holding, concluding that, under the policy exclusion, " '[s]o long as the injury was intended, willed, or maliciously sought, *it is immaterial that an injury of a different nature from that actually contemplated in fact resulted.'* [Citation.] . . . [¶] . . . [The insured] clearly acted with the wrongful

intent to cause damage to the property against which he set the fire. It is immaterial that he subjectively did not expect or intend to cause the extent of damage which actually occurred." (159 Cal.App.3d at pp. 290-291.) The Court of Appeal added that this conclusion " 'recognizes the correlation [between act and intent] only where reason mandates that from the very nature of the act, harm to the injured party must have been intended.' [Citation.]" (*Id.* at p. 291, fn. 9.) It is apparent that the "greater than expected" ruling, and the rule the trial court adopted with respect to the Mouat site, were considerably broader than *USF&G*'s alternative holding, but this perception is insufficient in and of itself to establish that either the "greater than expected" ruling or the instruction was an erroneous statement of the law: *USF&G* does not foreclose a broader rule in appropriate circumstances.

FMC supplements its analysis of *USF&G* with a citation to *J. C. Penney Casualty Ins. Co.* v. *M. K.* (1991) 52 Cal.3d 1009 [278 Cal.Rptr. 64, 804 P.2d 689], which holds that Insurance Code section 533 proscribes liability insurance coverage for harms caused by sexual molestation of a child but, like *USF&G*, does not necessarily foreclose a broader rule.

For affirmative support for its assertion that, "where the act is not inherently harmful as a matter of law," distinctions can and should be drawn among expectations of soil contamination, soil damage, and groundwater damage, FMC relies on *Chemical Leaman Tank Lines* v. *Aetna Cas. and Sur.* (D.N.J. 1993) 817 F.Supp. 1136, 1151-1152 (*Chemical Leaman I*), *Chemical Leaman Tank Lines* v. *Aetna Cas. & Sur. Co.* (3d Cir. 1996) 89 F.3d 976, 987-988 (*Chemical Leaman II*), and *Shell Oil Co.* v. *Winterthur Swiss Ins. Co.*, *supra*, 12 Cal.App.4th 715, 747, and also seeks support by analogy in *Chu* v. *Canadian Indemnity Co.* (1990) 224 Cal.App.3d 86, 98-99 [274 Cal.Rptr. 20], a construction defect case.

Three of these cases are of only limited relevance to the narrow question whether, under the London policies and California law, a showing of any third party property damage that was not unexpected from the standpoint of the insured would bar coverage for the insured's liability for all third party property damage from the same cause.

*Shell*, a highly significant decision for many purposes, appears not to have been called upon to address this question and in fact does not address it, although some of the opinion's language suggests (without analysis) an assumption, contrary to the trial court's implicit rule in this action, that there might be coverage for any element of third party property damage that was shown to be unexpected. FMC also assigns significance to *Shell*'s use of the

words "that kind of" in its statement of the "appropriate test for 'expected' damage": "whether the insured knew or believed its conduct was substantially certain or highly likely to result in *that kind of* damage." (12 Cal.App.4th at p. 748, italics added.) FMC concludes that these words imply a requirement that the "unexpectedly" issue be resolved separately as to every separately identifiable "kind" of third party property damage attributable to a single cause. We disagree with FMC. We are not persuaded that *Shell*'s choice of words either implies or compels such a requirement.

*Chu* concerned loss-in-progress issues and is in relevant respects both factually and analytically distinguishable from this action.

*Chemical Leaman I* was only one of two trial court opinions reviewed in *Chemical Leaman II*, which as a practical matter assimilates and supersedes *Chemical Leaman I*.

On the other hand, *Chemical Leaman II*, a federal court of appeals decision applying New Jersey law, provides thoughtful discussion of closely analogous issues.

In *Chemical Leaman II*, the insured under general liability insurance policies, issued by London insurers and containing an "occurrence" definition similar if not identical to that in the policies before us, sought coverage for its liability for remediation of environmental contamination. The federal district court instructed the jury, among other things, that " 'you must consider whether [the insured] subjectively expected or intended the very damage that is the subject matter of this case. Thus, it is not sufficient for you to find that [the insured] expected or intended any injury—such as injury to the environment generally. Rather, you must determine whether [the insured] expected or intended the actual property damage that it is now required to clean-up.' " (89 F.3d at pp. 986-987.) On appeal from a judgment on adverse verdicts, the insurers argued that the instruction had been erroneous in that the jury should have been instructed, arguably in accord with previous decisions of New Jersey state courts, that if the insured had " 'expected or intended' to cause some injury to the environment generally, then coverage was precluded unless the extent of the injury was improbable." (*Id.* at p. 987.)

The federal court of appeals disagreed with the insurers. Essentially acknowledging that the New Jersey courts had not yet gone so far, the court of appeals concluded that the New Jersey Supreme Court "would reject" the insurers' argument: "An insured who intentionally discharges a known pollutant generally intends 'some sort of harm,' however *de minimis*, and the

harm that actually results is usually a probable result of the discharge. Accordingly, the [insurers'] reading . . . would result in a general rule precluding coverage based on the knowing discharge of a pollutant. But . . . the New Jersey Supreme Court [has] held 'a general rule . . . [precluding coverage] simply on the basis of a knowing discharge of pollutants would be unjustified.' " (*Chemical Leaman II, supra,* 89 F.3d at p. 987.)

The court of appeals adopted the New Jersey Supreme Court's pledge to " 'attempt to reconcile two goals: that of deterring intentional wrongdoing by precluding insurance indemnification, and that of providing victims with compensation to the extent that compensation will not interfere with deterring injurious behavior.' " (*Chemical Leaman II, supra,* 89 F.3d at p. 988.) The court of appeals concluded that "[i]f an insured does not understand the causal connection between the discharge of a pollutant and the property damage that results, deterrence is not served by precluding insurance coverage. Moreover, where an insured does not intend or expect property damage of a particular nature to result from its discharge of pollutants, the insured has an 'objectively reasonable expectation' of coverage should such property damage later manifest itself. . . . [W]e believe the New Jersey Supreme Court would inquire into the insured's intent or expectation to cause environmental harm of a particular sort, for example, whether the insured intended damage to the soil, groundwater, or wetlands. . . . [A]n insured's intent to cause environmental harm of one sort will not preclude coverage for other kinds of unintended and unexpected environmental harm. For example, an insured's intent to cause soil damage will not preclude coverage for unintended and unexpected damage to the groundwater or wetlands." (*Ibid.*)

With due respect for the federal court of appeals' careful analysis of New Jersey law, we are not persuaded that its conclusion is or should be the law of California. The issue in the action before us is not—as it was in certain of the New Jersey state court cases the federal court of appeals discussed— whether an *expectation of third party property damage* can be presumed from the initial *act of knowing discharge* of pollutants. Here the jury was explicitly charged that it must find both that there was third party property damage and that "such resulting third-party property damage . . . was unexpected by the plaintiff." The instruction exactly corresponded to the language of the policies' "occurrence" definition.

Nor does the trial court's implicit rule disserve any public policy of which we are aware. If (as the policy language and the trial court's instruction required to avoid coverage) *any* of the third party property damage resulting from FMC's knowing release of pollutants was not unexpected from FMC's

perspective, then denial of coverage for *all* such property damage is entirely consistent with a policy of dissuading insureds from releasing pollutants which they subjectively expect to cause third party property damage.

We conclude that the trial court's rulings and instructions were valid under California law.

### ii. *Jacksonville and Malaga*

Jacksonville and Malaga were pesticide formulation facilities operated by FMC. At each site FMC had in various ways placed insecticide wastes on the surface of the site and the wastes had contaminated the soil and percolated into the groundwater. At the sixth trial the parties stipulated that third party property damage had resulted at each site during each policy period, and the jury was asked only to determine whether the damage had been *unexpected* from FMC's standpoint. At the London defendants' request and over FMC's objection, the trial court did give what FMC refers to as a "*USF&G* instruction" at the sixth trial, telling the jury that "if F.M.C. expected damage to third party property to result at any site, it is immaterial that the resulting third party property damage at that site may have been greater than or different from that which F.M.C. believed would occur." The jury found that the damage had *not* been unexpected at Jacksonville or Malaga, and on this basis the trial court denied coverage at Jacksonville and at Malaga.

The giving of the "*USF&G* instruction" raised the "greater than expected" issues even more directly with respect to Jacksonville and Malaga than they had been raised with respect to Mouat. But the giving of the instruction would not alter the analysis we have stated. In the circumstances of record the instruction was proper.

### 4. *Contamination as Damage*

At the sixth trial, at which the parties had stipulated to the existence of third party property damage and the only issue for the jury was whether the damage had been unexpected, the trial court instructed the jury, essentially for its guidance in approaching the "unexpectedly" issue, that "property damage . . . means loss of or direct knowledge [the written instruction from which the court read said 'damage'] to or destruction of tangible third party property. [¶] Third party property means or is to be distinguished from property owned by plaintiff. [¶] Third party property is all other property, all nonowned property. [¶] Now, at the Ennis site [not involved in these appeals], the third party property damage for which F.M.C. is liable is off-site groundwater contamination damage. [¶] Ennis is off-site groundwater contamination damage. [¶] At the Malaga site, the third party property

damage for which F.M.C. is liable is groundwater and off-site soil contamination damage. [¶] At Malaga it's groundwater and off-site soil contamination damage. [¶] And at the Harlingen [not involved in these appeals] and Jacksonville sites, the third party property damage for which F.M.C. is liable is on and off-site soil and groundwater contamination damage. [¶] Harlingen and Jacksonville, it's on and off-site soil contamination, soil and groundwater contamination damage."

On appeal FMC argues that, by its repetitive use of the phrase "contamination damage," the trial court erroneously led the jury to believe that there was an equivalence between "contamination" and "damage" such that if the jury believed "contamination" had not been unexpected from FMC's standpoint then it must necessarily conclude that "damage" had not been unexpected. The crux of FMC's argument is its assertion that although "today's stringent environmental laws" might declare that "contamination" is equivalent to "damage," it was "manifestly unjust" to suggest to the jury, for the purpose of determining what FMC's subjective expectations would have been in the 1960's, that *at that time*, 30 years before the time of trial, such expectation as FMC might have had that its activities would *contaminate* the environment should be deemed tantamount to an expectation that its activities would *damage* the environment within the meaning of the policy language. FMC adds an argument that this asserted injustice "was compounded by the trial judge's erroneous refusal to allow FMC to introduce evidence or to argue that laws and community standards pertaining to waste disposal were vastly different in the 1960s than they are now."

We find FMC's argument unpersuasive. We agree with the London defendants that "the use of the adjective 'contamination' to modify the word 'damage' " in the instruction of which FMC complains "appropriately describes for the jury the type of damage for which FMC claims insurance coverage."

FMC's reference to an asserted refusal to allow evidence is apparently based on the trial court's order granting London defendants' *in limine* motion to preclude (for example, and among other things) "[r]eferences to what lay people, businesses or corporations (other than what was communicated to FMC) purportedly thought about the environment in the 1950s, 1960s, and 1970s, or awareness of the environmental concerns of lay people or businesses in the 1950s, 1960s and 1970s," and "[r]eferences that environmental regulations are more numerous or are stricter in recent years than in the 1950s, 1960s and 1970s." Again we agree with the London defendants: The trial court's order was fully justifiable in terms of weighing the relatively slight probative force of the precluded evidence against its substantial potential for undue consumption of time and confusion of issues.

(Cf. Evid. Code, § 352.) In any event FMC concedes that it advances this point not as an assertion of independent error but only as one aspect of its contention that the trial court's use of the term "contamination damage" was error. We conclude that the point is not well taken for either purpose.

*"All Sums"*

Within the terms and limitations of their umbrella policies the London defendants agreed to indemnify FMC for "all sums" which FMC should become obligated to pay by reason of specified liabilities.

The trial court initially construed the scope of the London defendants' indemnification obligation quite narrowly, ruling that FMC would be required to establish a trigger of coverage on a period-by-period basis and would be entitled to indemnification only as to damages that occurred within a policy period as to which it had established a trigger of coverage. At the first four trials in this action, the trial court made these initial rulings the basis for a determination that the amount of indemnity to which FMC would be entitled, for damages characteristically spread over many policy periods, should be determined by *allocation* between the insurers (for periods in which coverage had been established) and FMC (for periods in which FMC was uninsured or for any other reason had not established coverage). At the first trial the parties resolved the allocation issues by stipulation, but allocation issues were tried to the court, after the jury phase on coverage issues, at the second, third and fourth trials.

Meanwhile, in *Montrose II* (filed more than two years after the trial court's initial ruling), the Supreme Court had effectively vitiated the trial court's determination that what the Supreme Court characterized as an "injury-in-fact trigger" of coverage should be applied period by period. In circumstances broadly analogous to those of this action the Supreme Court endorsed, instead, the continuous injury or multiple trigger we have described above.

And several months later, in *Armstrong World Industries, Inc.* v. *Aetna Casualty & Surety Co., supra,* 45 Cal.App.4th 1, an asbestos case, the Court of Appeal, First Appellate District read the "all sums" language of standard form CGL policies very broadly: "[O]nce coverage is triggered, the insurer's obligation to the policyholder is to cover the policyholder's liability 'in full' up to the policy limits. It is irrelevant that only part of the asbestos-related disease developed during any single policy period or during a period in which the manufacturer had no insurance. The logical consequence of this ruling is that the policyholder is covered (up to the policy limits) for the full

extent of its liability and need not pay a pro rata share. [Citations.]" (45 Cal.App.4th at p. 57.)

*Armstrong World Industries* in pertinent part cited and relied on *Keene Corp.* v. *Ins. Co. of North America* (D.C. Cir. 1981) 667 F.2d 1034 [215 App.D.C. 156], also an asbestos case, in which the federal court of appeals had held among other things that "only one policy's limits can apply to each injury. [The insured] may select the policy under which it is to be indemnified. [Citation.]" (667 F.2d at pp. 1049-1050.) *Armstrong World Industries* noted that in the case before it the trial court had ruled, consistent with *Keene*, that "only one policy's limits can apply to each claim, and the policyholder may select the policy under which it is to be indemnified," and that on appeal "[t]he policyholders have not challenged this ruling." (45 Cal.App.4th at p. 50, fn. 15.)

At the fifth trial in this action the trial court conducted a separate nonjury allocation hearing under its previous rulings but then, on motion for reconsideration before entry of its fifth trial "judgment," took cognizance of *Armstrong World Industries*, reversed the position it had previously taken, ruled that allocation was *not* required, and adopted the following language for use (with slight variations) in the fifth and subsequent "judgments": "[U]nder *Armstrong World Industries*, each insurance policy of the London defendants from August 5, 1964, to October 1, 1970, is triggered and each must pay, subject to its policy limits, retentions, underlying insurance limits and other policy language, and subject to the anti-stacking qualifications of the 'all sums' analysis (per *Armstrong World Industries* and *Keene Corp.*), all sums that FMC is legally obligated to pay as damages to investigate and to remediate the third-party property damage for which plaintiff is liable at the [pertinent] sites."

The trial court's reference to "anti-stacking qualifications" may be understood to mean *Keene*'s statement that (as subsequently paraphrased in *Armstrong World Industries*) "only one policy's limits can apply to each claim, and the policyholder may select the policy under which it is to be indemnified." (45 Cal.App.4th at p. 50, fn. 15.)

On appeal the parties agree that the allocation incorporated in the first trial "judgment" is not subject to reversal or modification by this court inasmuch as it was based on the stipulation of the parties. FMC attacks, and the London defendants defend, the allocation rulings incorporated in the second, third, and fourth trial "judgments." As to the fifth, sixth, seventh, and eighth trial "judgments," the London defendants attack the trial court's "all sums" ruling, and FMC defends the general import of the ruling while raising three

issues concerning the scope and provisions of the "judgments" the trial court entered.

### 1. *Armstrong World Industries*

The London defendants attack the *Armstrong World Industries* "all sums" analysis and the trial court's endorsement of it, arguing that the trial court's earlier orders were based on sounder reasoning, that the "all sums" position is "inconsistent with the policy language, the expectations of the parties, and numerous principles of insurance law," that the Supreme Court's recent decision in *Buss* v. *Superior Court, supra,* 16 Cal.4th 35 supports allocation between insurer and insured, that "all sums" would mean an unwarranted windfall for FMC, and that "nearly every decision in the country" agrees with the London defendants' position.

Our own review satisfied us that the *Armstrong World Industries* analysis is sound; we shall respond only briefly to the London defendants' specific arguments.

The London defendants argue that "[t]he 'all sums' approach disregards the essential policy period limitation." The crux of this argument is the London defendants' theory that the reference in the policies' definition of "occurrence" to "property damage . . . during the policy period" limits the scope of coverage to the policy period. The argument appears to disregard the distinction between *trigger* of coverage and *scope* of coverage. The policies' "occurrence" definition, read with the insuring provisions, simply makes clear what must occur during the policy period in order for coverage to attach. Once coverage has attached—i.e., once it has been triggered—it will extend to all of the insured's liability for damages attributable to the same occurrence in and after the policy period. Thus, for example, one condition of the London policies was that (subject to other policy terms) "in the event that . . . property damage arising out of an occurrence covered hereunder is continuing at the time of termination of this policy Underwriters will continue to protect the Assured for liability in respect of such . . . property damage without payment of additional premium."

Next the London defendants assert that "[t]he 'all sums' approach is inconsistent with the reasonable expectations of the parties." They rely on evidence that FMC actively sought to procure other insurance in the 1970's, and argue that it is also "unreasonable to think that London Insurers would issue policies, the ultimate scope of liability of which would turn on whether the insured purchased subsequent insurance from which London Insurers could later seek contribution." They quote *Buss* v. *Superior Court, supra,* 16

Cal.4th 35: " 'Surely, even if the policy's language were unclear, the hypothetical insured could not have an objectively reasonable expectation that it was entitled to what would in fact be a windfall.' (16 Cal.4th at 59.)" But their argument begs the question of what these parties would have intended by the words "all sums." In any event recourse to the parties' unexpressed expectations is normally appropriate only to resolve ambiguities in policy language (cf., e.g., *AIU Ins. Co.* v. *Superior Court, supra,* 51 Cal.3d at pp. 821-822), and in this case the plain policy language leaves no room, in this respect, for speculation as to the parties' expectations.

The London defendants briefly assert that "[t]he 'all sums' approach applied here effectively imposes joint and several liability on London Insurers, a result expressly disapproved in *Montrose II*" and in conflict with cases such as *Hartford Accident & Indemnity Co.* v. *Superior Court* (1994) 29 Cal.App.4th 435, 441 [34 Cal.Rptr.2d 520]. The word "effectively" presumably reflects the London defendants' understanding that they would not literally be jointly and severally liable: As *Armstrong World Industries* itself pointed out, ". . . the doctrine of joint and several liability has no application to the obligations of successive insurers of a single policyholder." (45 Cal.App.4th at p. 55, fn. omitted; cf. *Hartford Accident & Indemnity Co.* v. *Superior Court, supra,* 29 Cal.App.4th 435, 441.) The London defendants' point appears to be that by virtue of the trial court's "all sums" ruling they might unfairly be required to answer for sums which, in fairness, should be allocated to other insurers. In the usual case these concerns would be addressed in proceedings, independent of the determination of each individual insurer's liability to its insured, to allocate a paid loss among all insurers on the risk on the basis of contractual other-insurance provisions or equitable considerations. (Cf. *Montrose II, supra,* 10 Cal.4th at p. 665.) The London defendants argue that such proceedings would be "completely illusory" in this case, where (in the London defendants' view) "other insurers generally do not provide coverage due to exclusions (like the pre-1964 deemer exclusions and post-1970 pollution exclusions) . . . ." The record before us would not permit evaluation of whether other insurers would be on the risk with the London defendants for purposes of separate allocation proceedings among insurers. But in any event the availability of allocation among multiple insurers is essentially irrelevant to each individual insurer's obligation to its insured under the terms of the parties' insurance contract. (Cf. *Montrose II, supra,* 10 Cal.4th at p. 665; *Armstrong World Industries, Inc.* v. *Aetna Casualty & Surety Co., supra,* 45 Cal.App.4th at p. 56; see generally, *Aerojet-General Corp.* v. *Transport Indemnity Co., supra,* 17 Cal.4th at p. 75.)

The London defendants next argue that the "all sums" approach "nullifies" Insurance Code section 533, which provides in pertinent part that "[a]n

insurer is not liable for a loss caused by the wilful act of the insured . . . ." For example, the London defendants argue, "if a jury finds that coverage for property damage at a site was barred after 1970 under Insurance Code [section] 533, the 'all sums' theory nonetheless permits the insured to transfer liability for *all* property damage (even the post-1970 damage) onto the pre-1970 policies." But the London defendants do not make clear why, in circumstances which might be shown to fit its example, it could not successfully invoke section 533 as to those portions of "all sums" to which the statute could be shown to apply. We perceive no reason why the "all sums" analysis and section 533 cannot coexist.

The London defendants assert that "[t]he 'all sums' approach fails to differentiate between new property damage at the sites and the continued existence of old property damage." They argue that "[p]roperty damage first occurring *after* a policy expires is insufficient to trigger that prior policy." Again the London defendants appear to disregard the important distinction between trigger of coverage (which must occur within the policy period) and scope of coverage (which may extend to liability for all consequent injury).

The London defendants seek support for apportionment between insurer and insured in *Buss* v. *Superior Court, supra,* 16 Cal.4th 35.

In *Buss* the policy included a duty to defend, and the issue before the Supreme Court was whether and on what terms, in what the Supreme Court called a " 'mixed' action" against the insured including both potentially covered claims and claims that were not even potentially covered, the insurer (having undertaken the defense as to *all* claims under a reservation) could obtain reimbursement from the insured for the cost of defending against the claims that were not even potentially covered. The Supreme Court's answer was a qualified yes, but the opinion made clear that reimbursement would need to be based on an allocation between costs attributable "solely to claims that are not even potentially covered" and all other defense costs. (16 Cal.4th at p. 39.) These principles were recently reaffirmed in *Aerojet-General Corp.* v. *Transport Indemnity Co., supra,* 17 Cal.4th at pp. 56-60.

The London defendants' premise is that "the environmental claims" here similarly "involved covered and uncovered claims" and thus that this was a "mixed action" also. In *Buss* the Supreme Court based its conclusion that the insurer could seek reimbursement for costs of defending "claims that are not even potentially covered" in part on the perception that the insurer had not bargained, or been paid, to defend such claims. (16 Cal.4th at pp. 50-51.) The London insurers argue that, similarly, they did not bargain, or receive premiums, to provide coverage for liability for damages outside the policy period.

This argument necessarily depends on one's reading of the London policies. For reasons we have intimated, we read these policies to require the London defendants to pay "all sums" once coverage has been triggered, and we consider it appropriate to assume that the London defendants negotiated their premiums with this requirement in mind.

We find no windfall for FMC in receiving the "all sums" coverage for which it bargained and paid. (See generally, *Aerojet-General Corp.* v. *Transport Indemnity Co., supra,* 17 Cal.4th at p. 75.)

The London defendants' citations to several cases, from this and other jurisdictions, which analyze a variety of policy language, do not dissuade us from our conclusions that the First Appellate District's analysis of "all sums" in *Armstrong World Industries* was sound and that the trial court properly adopted *Armstrong World Industries*' analysis. In light of our conclusion, we need not address FMC's criticisms of the allocation provisions of the second, third, and fourth trial "judgments"; we shall, instead, simply modify those "judgments" to conform to the *Armstrong World Industries* "all sums" analysis.

### 2. *Judgment*

But we must address FMC's contentions that in *applying* the *Armstrong World Industries* "all sums" analysis to arrive at "judgments" following the fifth, sixth, seventh, and eighth trials the trial court erred in three respects:

(1) When the trial court endorsed *Armstrong World Industries*, FMC for the first time proposed that it should receive money judgments now, in this proceeding, rather than simply the declarations of its *right* to indemnity it had initially sought. The trial court's response was, in essence, that it was too late for FMC to seek to alter the entire procedural thrust of its lawsuit. FMC complains of this ruling.

(2) FMC complains of the judgment's broad reference to "other policy language," arguing that it leaves "virtually any coverage defense" open to future litigation, and argues that the trial court should have permitted FMC "to litigate all remaining uncertainties regarding its rights under the policies" in this proceeding.

(3) As to the trial court's reference to "anti-stacking qualifications," FMC argues that *Armstrong World Industries* did not directly resolve the anti-stacking issue and that subsequent decisions "make abundantly clear that any implied 'anti-stacking' rule is contrary to California law."

FMC's first two points are untimely. Having chosen to seek, as to the London defendants, only specified declaratory relief, and having received that relief, they could not reasonably have expected, after literally years of trial preparation and trial, that the trial court would reopen the same proceedings to give FMC, in essence, another trial on greatly expanded theories of relief. At this stage the only solace we can offer FMC is that it can reasonably and properly insist that, in ongoing negotiations for indemnification under coverage to which FMC has been found entitled, the London defendants comply in good faith with the rulings already made.

 FMC's third point is more complex. Potentially the most troublesome element of the *Armstrong World Industries* clause of the "judgments" is its provision that FMC's right to recover "all sums" should be "subject to the anti-stacking qualifications of the 'all sums' analysis (per *Armstrong World Industries* and *Keene Corp.*) . . . ."

The concepts of "stacking" and "anti-stacking" warrant brief introduction.

 "Stacking policy limits means that when more than one policy is triggered by an occurrence, each policy can be called upon to respond to the claim up to the full limits of the policy. Under the concept of stacking . . . the limits of every policy triggered by an 'occurrence' are added together to determine the amount of coverage available for the particular claim. Thus, for example, if an insured could establish that each of four consecutive $10 million policies were triggered by a particular claim, the insured could recover $40 million for a single occurrence, rather than the $10 million available under any single policy." (Ostrager & Newman, Insurance Coverage Disputes (9th ed. 1998) Trigger and Scope of Coverage, § 9.04[c], p. 464.)

 The "stacking" concept could apply in the circumstances of this case. London policy Nos. K 79446 and CX2062 each provided, subject to certain specific exceptions, limits of $1 million (over and above underlying coverages where appropriate) for each "occurrence" and also "in the aggregate for each annual period where applicable." Policy No. K 79446 declared six annual policy periods (the first being the short period from August 5 to October 1, 1964), and policy No. CX2062 was in effect for only the policy year ending October 1, 1970 (the effective date of the first pollution exclusion). Characteristically there was only one "occurrence," based on "a continuous or repeated exposure to conditions," at any particular site. But by application of the continuous injury trigger identified and approved in *Montrose II*, that single occurrence could be deemed (depending on the facts) to have triggered coverage in more than one, or all, of the policy periods. By

application of the "stacking" concept, at any particular site FMC might have aggregated up to $7 million in liability coverage (over and above underlying coverages), for a single occurrence, under London policies which specified a $1 million per-occurrence limit.

This kind of "stacking" of the limits of an insurer's policies for consecutive policy periods has been criticized as affording the insured substantially more coverage, for liability attributable to any particular single occurrence, than the insured bargained or paid for. (Cf., e.g., *Ins. Co. North America* v. *Forty-Eight Insulations* (6th Cir. 1980) 633 F.2d 1212, 1226, fn. 28 [a variant of "stacking" "amounts to giving [the insured] much more insurance than it paid for"]; *Uniroyal, Inc.* v. *Home Ins. Co.* (E.D.N.Y. 1988) 707 F.Supp. 1368, 1392 ["stacking in this manner makes the aggregate limits and the separately negotiated premiums for each policy illusory by expanding coverage to the sum of both policies"].)

Insurers sometimes include "anti-stacking" provisions in their policies to avoid just this kind of result. Where, as in this action, there is no anti-stacking provision, there is precedent, characteristically in asbestos cases, for judicial intervention.

Thus in *Ins. Co. North America* v. *Forty-Eight Insulations*, *supra*, 633 F.2d 1212, the federal court of appeals agreed with the district court that " '[i]n any event, no insurer should be held liable in any one case to indemnify Forty-Eight for judgment liability for more than the highest single yearly limit in a policy that existed during the period of the claimant's exposure for which judgment was obtained. . . .' [¶] . . . The initial exposure to asbestos fibers in any given year triggers coverage. However, under the terms of the policies, additional exposure to asbestos fibers is treated as arising out of the same occurrence. Thus, on its face, the liability of each insurer is limited to maximum amount 'per occurrence' provided by each policy. We have no problem with the district court's extending the policy language so that each insurer would face no more liability per claim than the maximum limit it wrote during any applicable year of coverage." (633 F.2d at p. 1226, fn. 28.)

*Keene Corp.* v. *Ins. Co. of North America*, *supra*, 667 F.2d 1034, citing *Forty-Eight Insulations*, dealt similarly with the stacking issue: "Keene claims that it is entitled to full indemnity for each injury up to the sum of the limits provided by the applicable policies. We do not agree. The principle of indemnity implicit in the policies requires that successive policies cover single asbestos-related injuries. That principle, however, does not require that Keene be entitled to 'stack' applicable policies' limits of liability. To the

extent possible, we have tried to construe the policies in such a way that the insurers' contractual obligations for asbestos-related diseases are the same as their obligations for other injuries. Keene is entitled to nothing more. Therefore, we hold that only one policy's limits can apply to each injury. Keene may select the policy under which it is to be indemnified." (667 F.2d at pp. 1049-1050.)

*Armstrong World Industries* touched on stacking only in the footnote from which we have previously quoted, noting that the trial court had adopted *Keene*'s approach and that "[t]he policyholders have not challenged this ruling." (45 Cal.App.4th at p. 50, fn. 15.)

FMC cites *Community Redevelopment Agency* v. *Aetna Casualty & Surety Co.*, *supra*, 50 Cal.App.4th at page 340, and *Stonewall Ins. Co.* v. *City of Palos Verdes Estates* (1996) 46 Cal.App.4th 1810, 1849 [54 Cal.Rptr.2d 176], for the proposition that "any implied 'anti-stacking' rule is contrary to California law," and *Cole* v. *Celotex Corp.* (La. 1992) 599 So.2d 1058 and *J.H. France Refractories* v. *Allstate* (1993) 534 Pa. 29 [626 A.2d 502] for the proposition that the "anti-stacking" rule of *Forty-Eight Insulations* and *Keene* "has been rejected by a number of courts applying multiple triggers of coverage." None of these cases is dispositive. *Community Redevelopment Agency* is essentially a duty-to-defend case which does not address stacking or anti-stacking. *Stonewall* does not analyze the issue and appears to base its conclusion at least in part on a stipulation between the parties. *Cole* expresses support for a generalized concept of "stacking," but undertakes to distinguish *Keene* and acknowledges that Louisiana's approach to the issue is perceived to be sui generis. (599 So.2d at p. 1077, fn. 56; cf. Ostrager & Newman, Insurance Coverage Disputes, *supra*, Trigger and Scope of Coverage, § 9.04[c], p. 467 ["Louisiana appears to be the only jurisdiction that permits stacking in the context of cumulative injury tort cases"].) And *J.H. France Refractories* deals with the distinct issue of allocation of coverage among multiple insurers.

In proceedings to settle the fifth trial "judgment" in this action, the trial court indicated a strong belief that the anti-stacking rule was integral to *Armstrong World Industries*' all-sums holding, but the trial court's only formal ruling on the point was that implied by the fifth trial "judgment" the court subsequently filed and from which we have quoted.

Although we disagree with the trial court's perception that the anti-stacking rule was integral to *Armstrong World Industries*, we agree with the sense of its conclusion that *Keene*'s statement of such a rule is appropriate in the circumstances of this case for reasons well articulated in *Keene* and

cognate cases. Because in the case before us coverage is ultimately keyed to and limited by the concept of "occurrence," and because the London defendants provided multiple layers of coverage, with varying effective dates, in each policy period, application of *Keene*'s rule in this case is relatively complex. For clarity we shall modify the judgment herein to substitute for the trial court's references to "the anti-stacking qualifications of . . . *Armstrong* and *Keene*" a provision that only the policy limits of London umbrella and excess policies in effect as of July 1 in one of the policy periods in which coverage is triggered for a single occurrence can apply to property damage attributable to that occurrence, but that if coverage for that occurrence is triggered in more than one policy period FMC may select the policy period in which the policy limits are to be fixed.

### *"Deemer," "Drop Down," and Addendum No. 3*

In the primary general liability policies it issued throughout the 1964-1970 period and until its final policy year, 1974-1975, Liberty Mutual included variants of a provision which, in one of its forms, read as follows: "Property damage caused by exposure to conditions and occurring partly before and partly during the policy period shall be deemed to result from an occurrence during the policy period if claim therefor is first made during the policy period. The policy does not apply to such property damage unless claim therefor is made during the policy period; but the foregoing exclusion shall not be applicable if this policy is not renewed or is canceled and not replaced by other insurance written by the company."

Provisions such as these are known, presumably on the basis of the "shall be deemed" language of each provision, as "deemer" clauses. (Cf. Ostrager & Newman, Insurance Coverage Disputes, *supra*, Trigger and Scope of Coverage, § 9.03[c], p. 452; *Endicott Johnson Corp.* v. *Liberty Mut. Ins. Co.*, *supra*, 928 F.Supp. at p. 179.) In practical effect a "deemer" clause such as this limits the insurer's exposure to the coverage limit applicable to a single policy period and thus functions as an anti-stacking provision. Liberty Mutual took the position "that the 'obvious effect' of the deemer language is to ' "telescope" coverage for continuous/repeated exposure losses to a single policy year' " which, in this instance, was Liberty Mutual's final policy year, 1974-1975.

During preliminary proceedings, before the first trial, FMC moved for a ruling that the Liberty Mutual policies provided broader coverage, but in what came to be known as the "deemer" ruling the trial court agreed with Liberty Mutual's restrictive interpretation of its policies. FMC sought review of the "deemer" ruling on its appeal following the first trial "judgment";

thereafter FMC settled with Liberty Mutual, mooting its appeal as to issues involving Liberty Mutual. FMC and the London defendants agree we must assume the validity of the "deemer" ruling for purposes of this appeal.

Meanwhile, against the possibility the "deemer" ruling would stand, FMC looked for some other way to obtain primary coverage for policy periods before 1974-1975. Its most obvious recourse for 1964 to 1970 was to the London defendants' umbrella policies.

The umbrella policies provided in pertinent part that (given all other conditions of coverage) the London defendants would be liable for FMC's "ultimate net loss," to the specified maximum limit of $1 million per occurrence, insofar as the ultimate net loss should exceed whichever of two alternative threshold amounts was applicable to the particular occurrence. The alternative threshold amounts were specified in the policies' "insuring Agreement II (a)" and "insuring Agreement II (b)":

"Insuring Agreement II (a)" defined a threshold amount of "the limits of the underlying insurances [i.e., the Liberty Mutual policies] . . . in respect of each occurrence covered by said underlying insurances . . . ." Thus on its face "insuring Agreement II (a)" provided "excess insurance" (cf. *Community Redevelopment Agency* v. *Aetna Casualty & Surety Co.*, *supra*, 50 Cal.App.4th at pp. 337-338), over and above Liberty Mutual's policy limits once those limits had been exhausted, for any occurrence covered by the Liberty Mutual policies.

"Insuring Agreement II (b)" set a threshold amount of $25,000 under policy No. K 79446, and $100,000 under policy No. CX2062, "in respect of each occurrence not covered by said underlying insurances . . . ." On its face "insuring Agreement II (b)" permitted the umbrella coverage to "drop down" (cf., e.g., *Wells Fargo Bank* v. *California Ins. Guarantee Assn.*, *supra*, 38 Cal.App.4th at p. 939; *Coca Cola Bottling Co.* v. *Columbia Casualty Ins. Co.*, *supra*, 11 Cal.App.4th at pp. 1178-1181) below the coverage limits of underlying policies to provide coverage (in excess of the $25,000 or $100,000 self-insured retention) not provided by the underlying policies. (Cf. *Reserve Insurance Co.* v. *Pisciotta* (1982) 30 Cal.3d 800, 812 [180 Cal.Rptr. 628, 640 P.2d 764].)

The London umbrella policies did not contain "deemer" clauses as such. FMC took the position that, absent a "deemer" clause in the London defendants' own policies, the London defendants' coverage between 1964 and 1970 should have dropped down, under "insuring Agreement II (b)," to cover any liability for property damage that was excluded from Liberty

Mutual's coverage policies by the "deemer" clause. FMC sought a pretrial ruling consistent with this position.

The London defendants responded that from the inception of their coverage on August 5, 1964, until June 20, 1969, FMC's drop-down theory was vitiated by an "Addendum No. 3" to policy No. K 79446.

Addendum No. 3, added to policy No. K 79446 on August 11, 1964, but retroactively effective from August 5, read as follows:

"In respect of the insurance afforded by this Policy for the ultimate net loss in excess of the amount provided in insuring Agreement II (a), and notwithstanding anything contained herein to the contrary, this policy shall be subject to the same Insuring Agreements, Definitions, Exclusions, Conditions and other terms (except as regards the premium, the obligation to investigate and defend, the renewal agreement (if any), the expiry date and the amounts and limits of liability) as are contained in the policies of the Underlying Insurances as set out in the Schedule attached to this Policy.

"Nevertheless, the Underwriters hereon shall only be liable for the ultimate net loss, the excess of the Limits of the Underlying Insurances as set out in the Schedule attached to this policy.

"In respect of the insurance afforded by this policy for the ultimate net loss in excess of the amount provided in insuring Agreement II (b), this insurance shall be subject to the Coverage, Definitions, Exclusions and Conditions as are contained in this policy."

As of June 20, 1969, Addendum No. 3 was replaced by a substantially different provision. Our analysis of the issue before us focuses on the period during which Addendum No. 3 was in effect.

On its face, Addendum No. 3 caused policy No. K 79446's *excess* coverage, under "insuring Agreement II (a)," to "follow form" (with specified exceptions, and without altering the excess coverage threshold) with the underlying Liberty Mutual policies, but provided that the policy's *drop down* coverage, under "insuring Agreement II (b)," would be provided on the terms and conditions of policy No. K 79446 itself and thus would *not* "follow form" with the Liberty Mutual policies.

The London defendants argued that, by virtue of Addendum No. 3, policy No. K 79446 "followed form" with the Liberty Mutual "deemer" clause for all purposes relevant to FMC's coverage claims. Manifestly the London

defendants' argument depended on the premise that the occurrences on which FMC's coverage claims were based were "covered" by the Liberty Mutual policies within the meaning of "insuring Agreement II (a)," because the "follow form" provision of Addendum No. 3 applied only to the excess coverage to which "insuring Agreement II (a)" applied. To establish their premise, the London defendants argued in necessary effect that any occurrence that came within the broad types or categories of coverage under the Liberty Mutual policies—personal injury and property damage—was "covered" within the meaning of "insuring Agreement II (a)" regardless of the operation of any specific policy exclusion or limitation of coverage such as the "deemer" clause. The logical effect of the London defendants' argument (if accepted) would be *both* to deny "drop down" coverage (and thus to provide only coverage in excess of Liberty Mutual's policy limits) for any property damage claim, regardless of the applicability of Liberty Mutual's "deemer" clause, *and* to incorporate and apply Liberty Mutual's "deemer" clause to the London policies' excess coverage with respect to any claim to which the "deemer" clause would apply under the Liberty Mutual policies.

FMC replied that if the practical effect of the "deemer" clause, as construed by the trial court, was to deny coverage under the Liberty Mutual policies for what would otherwise have been an occurrence or occurrences during the 1964-1969 period in which Addendum No. 3 was in effect, then manifestly such occurrences were *not* "covered" within the meaning of the insuring agreements and the London policies should "drop down" under "insuring Agreement II (b)," upon their own terms and conditions in light of Addendum No. 3, to provide the coverage Liberty Mutual did not provide.

The London defendants also argued that in any event policy No. K 79446 would not drop down into any gaps created by Liberty Mutual's "deemer" clauses, either because FMC had concealed or misrepresented the Liberty Mutual "deemer" clauses or because there was mutual mistake as to their existence. FMC disputed the London defendants' misrepresentation-or-mistake arguments.

The trial court initially denied FMC's "drop down" motion, without prejudice to a renewed motion later in the proceedings, because in the court's view there were too many unresolved factual issues, particularly as to the London defendants' misrepresentation-or-mistake arguments, to permit a ruling until there had been an opportunity to submit those issues to a trier of fact.

The question arose again after the first trial and before entry of the first trial "judgment." By this time the London defendants apparently had

dropped their misrepresentation-or-mistake arguments. On the remaining issues the trial court ruled in favor of FMC's position, rejecting the London defendants' argument that "occurrence covered" and "occurrence not covered" in the insuring agreements referred to general types or categories of coverage rather than to specific coverage determinations in light of policy exclusions or limitations, and concluding in necessary effect that the London policies would drop down to provide coverage above the $25,000 self insured retention for any occurrence excluded from the Liberty Mutual coverage by the "deemer" clause.

In each of their eight cross-appeals the London defendants assert that the trial court misconstrued the policy language. Over the course of the eight appeals they have developed upon their broad-types-of-risk argument by adding what might be called a reduction-to-absurdity argument.

### 1. *Types of Risk*

The London defendants' first argument is the one they advanced, in necessary effect, in the trial court: that the "only reasonable interpretation" of the words "occurrence covered by said underlying insurances" in "insuring Agreement II(a)" and "occurrence not covered by said underlying insurances" in "insuring Agreement II(b)" is that "they mean the *types of risk* within the scope of the Liberty Mutual primary, and *not* whether a particular claim is actually covered or not covered by virtue of an exclusion or condition in the primary. The two types of risk within the scope of the primary are property damage and personal injury claims." Thus, the London defendants argue, for *any* property damage claim, "the terms of the London Policy are conformed to those contained in the primary, including *exclusions*." On the other hand (the London defendants add) the Liberty Mutual primary policies did not provide coverage for so-called "advertising injury" risks while the London policies did provide advertising-injury coverage, so under "insuring Agreement II (b)" the London policies would drop down, and under Addendum No. 3 the London policies would not follow form to the Liberty Mutual policies, but only with respect to advertising injury.

The London defendants argue that their interpretation is "consistent with the circumstances of FMC's insurance program and the structure of general liability policies."

As to "the circumstances of FMC's insurance program," the London defendants argue that Addendum No. 3, assertedly sought and drafted by FMC, "was intended by FMC to transform the London Policy into a following form excess policy for *all* property damage claims." Presumably the

London defendants intend thus to invoke the rule that interpretation of an insurance contract is governed by the mutual intention of the parties at the time the contract is formed or, as in this case, modified. (Cf. *AIU Ins. Co.* v. *Superior Court, supra*, 51 Cal.3d at pp. 821-822.) But to have the benefit of the rule the London defendants must establish the premise that the parties intended the follow-form provision of Addendum No. 3 to extend to all property damage claims.

The requisite intent "is to be inferred, if possible, solely from the written provisions of the contract." (*AIU Ins. Co.* v. *Superior Court, supra*, 51 Cal.3d at p. 822.) Here the policy language by no means establishes the London defendants' premise. The London defendants themselves acknowledge that, by virtue of "insuring Agreement II (b)," policy No. K 79446 initially *"provided* 'drop down' insurance for claims excluded by underlying policies"; Addendum No. 3 does not on its face alter either of the insuring agreements but simply refers to them in providing, in essence, that policy No. K 79446 will follow form under "insuring Agreement II (a)" (the excess provision) but not under "insuring Agreement II (b)" (the drop down provision). "[I]f the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning." (*Ibid.*) FMC argues, with considerable force, that if "a claim fell within the broad insuring agreement of the primary policy, but also fell within the language of an express exclusion or coverage limitation therein, the average layperson could not reasonably understand such a claim to be 'covered' under the primary policy for purposes of determining whether the umbrella policy's 'drop down' coverage would apply."

If the terms "occurrence covered" and "occurrence not covered" in the insuring agreements were nevertheless deemed ambiguous, the London defendants would be permitted to marshal extrinsic evidence to prove "the sense [in which] the promisor (i.e., the insurer) believed the promisee understood [the ambiguous provisions] at the time of formation." (*AIU Ins. Co.* v. *Superior Court, supra*, 51 Cal.3d at p. 822.) But none of the extrinsic evidence the London defendants marshal supports their premise: The various testimony and communications to which they refer amply demonstrate that FMC understood what a follow form provision was, and that Addendum No. 3 included one, but give no indication of an intent that the preexisting meanings of "insuring Agreement II (a)" and "insuring Agreement II (b)" should be altered.

As to the structure of general liability policies, the London defendants invoke the Supreme Court's observation that a CGL, or business general liability, policy "is written in two essential parts: the insuring agreement,

which states the risk or risks covered by the policy, and the exclusion clauses, which remove coverage for risks that would otherwise fall within the insuring clause. [Citation.] Before 'even considering exclusions, a court must examine the coverage provisions to determine whether a claim falls within [the policy terms].' " (*Waller* v. *Truck Ins. Exchange, Inc., supra,* 11 Cal.4th 1, 16.) The thrust of the London defendants' argument appears to be that the concept of "coverage" embodied in the insuring agreements' references to "occurrence covered" and "occurrence not covered" should be deemed equivalent to the "basic scope of coverage" which the Supreme Court distinguished from "exclusions." (*Ibid.*) We find the argument essentially immaterial to the meaning of the language of the insuring agreements, in light of Addendum No. 3, in the London defendants' policy No. K 79446.

In short, the London defendants' argument, as developed to this point, would be insufficient to persuade us, upon de novo review of the policy language, to disagree with the trial court's ruling.

2. *Reduction to Absurdity*

Beginning in their reply brief on the first cross-appeal, and continuing in subsequent briefing, the London defendants augment their first argument by asserting that to construe the insuring agreements and Addendum No. 3 as FMC would construe them gives rise to a fundamental absurdity: The first sentence of Addendum No. 3 would make policy No. K 79446's coverages under "insuring Agreement II (a)" subject to the "same . . . Exclusions . . . [among other things] as are contained in the policies of the Underlying Insurances . . . ." But if (as FMC argues) any occurrence subject to a Liberty Mutual policy exclusion should be regarded as "not covered" by virtue of that exclusion and therefore should fall within "insuring Agreement II (b)" rather than "insuring Agreement II (a)," what is the remaining significance of the word "Exclusions" in the first sentence of Addendum No. 3? The crux of the London defendants' argument appears to be that *if* every occurrence as to which coverage under the Liberty Mutual policies is defeated solely by a policy exclusion is ipso facto to fall into "insuring Agreement II (b)," then no such occurrence would ever be subject to "insuring Agreement II (a)," and the word "Exclusions" in the first sentence of Addendum No. 3 would be meaningless.

"This interpretation," the London defendants argue, "reads the term 'exclusions' out of Addendum No. 3. Furthermore, if, as the trial court held, the London umbrella policy never follows form where a claim is excluded under the Liberty policy, the only purpose behind paragraph one of Addendum No. 3 is to broaden coverage to the extent a claim is covered under the primary,

but never to narrow coverage to the extent a claim is excluded under the primary. But again, this interpretation renders the term 'exclusions' in paragraph one of Addendum No. 3 meaningless. [¶] The only interpretation of Addendum No. 3 that gives meaning to all words in the provision is the meaning advanced by [the London defendants]: (1) that paragraph one of Addendum No. 3 renders the London umbrella a following form policy as to property damage and personal injury claims; and (2) that the last paragraph of Addendum No. 3 addresses advertising liability and specifies that as to these types of occurrences, the umbrella does not follow form."

FMC responds that the first sentence of Addendum No. 3 "incorporates exclusions contained in the underlying policies only where those exclusions bar coverage only in part," but that "[a]ny claim falling entirely within the terms of an exclusion in the underlying policy is 'not covered' by the underlying insurance, and coverage for such claim is governed only by the terms of the umbrella policy itself."

The London defendants' reduction-to-absurdity argument raises a troubling question. FMC's suggestion that the distinction between partial coverage and no coverage at all should be significant to the application of Addendum No. 3 has no apparent support in the policy language. But upon de novo review of the purely legal question of construction of the policy language, we conclude that the apparent anomaly the London defendants have identified is insufficient to compel a conclusion that "insuring Agreement II (a)" applies to *any* property damage occurrence without regard to policy exclusions. We cannot construe Addendum No. 3, read as a whole, as an amendment of what we perceive to be the plain language of the insuring agreements, and we take the plain meaning of the terms "occurrence covered" and "occurrence not covered" to be as FMC has urged: The dispositive question under the insuring agreements is whether the Liberty Mutual policies would afford coverage for the specific occurrence *after* all policy exclusions including the "deemer" clauses are taken into account.

Accordingly we conclude that the trial court's ruling was correct.

*Defense Costs for Potentially Covered Claims*

Primary CGL policies typically provide that (in language taken, as an example, from one of FMC's Liberty Mutual policies) the insurer "shall have the right and duty, subject to [specified policy] provisions . . . , to defend any suit against the *insured* seeking damages on account of such *personal injury* or *property damage*, even if any or all of the allegations of the suit are groundless, false or fraudulent."

The London defendants' umbrella and excess policies did not contain this typical duty-to-defend clause. Their policies No. K 79446 and No. CX2062 explicitly provided that "[t]he Underwriters shall not be called upon to assume charge of the settlement or defense of any claim made or suit brought or proceeding instituted against the Assured . . . ." The London defendants have steadfastly maintained that their policies obliged them only to *indemnify* FMC, within specified policy limits and subject to other conditions of coverage, for FMC's "ultimate net loss" as defined.

"Ultimate net loss," under the London policies, did extend to what could be broadly characterized as costs of defense: The term was defined to include "all sums paid as salaries, wages, compensation, fees, charges and law costs, premiums on attachment or appeal bonds, interest, expenses for doctors, lawyers, nurses and investigators and other persons, and for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder . . . ."

The policies' "loss payable" clause included a provision that "[t]he Assured shall make a definite claim for any loss for which the Underwriters may be liable under the policy within twelve (12) months after the Assured shall have paid an amount of ultimate net loss in excess of the amount borne by the Assured or after the Assured's liability shall have been fixed and rendered certain either by final judgment against the Assured after actual trial or by written agreement of the Assured, the claimant, and Underwriters. . . . Such losses shall be due and payable within thirty (30) days after they are respectively claimed and proven in conformity with this policy."

The London defendants essentially concede that if these and other coverage conditions were met it would be obliged, within its policy limits, to indemnify FMC for costs included in the definition of "ultimate net loss."

 FMC sought more than the London defendants were prepared to concede. Between the first and second trials, and a few months after the trial court's oral "drop down" ruling, FMC moved for summary adjudication that in any instance in which the Liberty Mutual policies did not provide coverage (and thus, as a practical matter in light of the "deemer" ruling, throughout the 1964-1970 periods), the London defendants would be required to indemnify FMC for costs incurred by FMC to defend against potentially covered claims of environmental damage *as soon as costs in excess of the self insured retention*—$25,000 under policy No. K 79446, or $100,000 under policy No. CX2062—*were incurred*, even if at that time the validity of any particular claim had not yet been established and might never be established.

The trial court denied FMC's motion. On appeal FMC seeks review of this ruling, relying primarily on (1) asserted analogies to liability policies which include (as these policies do not) a duty-to-defend clause, (2) an assertion that "where the primary insurer does not cover a claim, the umbrella insurer acts as a primary carrier and assumes the defense obligations of a primary carrier," and (3) a detailed argument to the ultimate effect that the policies' acknowledged requirement that the London defendants indemnify FMC for various defense costs in specified circumstances must be construed to require that the London defendants pay such costs as soon as FMC *incurred* the costs to defend against any claim even potentially covered by the policies.

We find FMC's argument wholly unpersuasive.

It is apparent to us that FMC's first point is the crux of its argument. Only if FMC can establish an analogy between policies (such as Liberty Mutual's primary policies) by which insurers explicitly assume a duty to defend, and the London policies which explicitly disavow such a duty, can FMC hope to invoke the policies and principles stated in the many duty-to-defend cases, such as *Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263 [54 Cal.Rptr. 104, 419 P.2d 168] and *Montrose Chemical Corp.* v. *Superior Court* (1993) 6 Cal.4th 287, 304 [24 Cal.Rptr.2d 467, 861 P.2d 1153] (*Montrose I*), on which it relies. Each of these cases addresses and construes an insurance contract or contracts which contain duty-to-defend clauses. There is no pertinent analogy between such cases and this matter.

Absent the kind of special policy provisions or representations contained in cases such as *Cranford Ins. Co., Inc.* v. *Allwest Ins. Co.* (N.D.Cal. 1986) 645 F.Supp. 1440, 1445-1447 (which FMC cites as an example), none of which appear in the London policies or in the record before us, FMC can marshall no precedent to support its second point. The policies' explicit disavowal of a duty to defend renders inapplicable the defense and costs-of-defense provisions of Civil Code section 2778. As we have seen, to the extent the London umbrella coverage might "drop down" to fill gaps in the primary coverage it would do so on its own terms—including its explicit disavowal of a duty to defend—and would not, for this purpose, "follow form" with the duty to defend, or any other provision, of the underlying policy or policies.

FMC's final point, as summarized at oral argument, is that the terms of the London policies "do require London to pay defense costs as they are incurred." We address the construction of the policy language de novo, as a question of law, and conclude that FMC is incorrect.

FMC relies among other things upon the implication of the London "loss payable" clause that the London insurers would be obliged to pay on any claim which FMC might make, within twelve months, for reimbursement for having paid "an amount of ultimate net loss in excess of the amount borne by the Assured . . . ." But the "loss payable" language incorporates the concept of "ultimate net loss," which the policy defines in pertinent part as amounts "paid as a consequence of any occurrence *covered hereunder* . . . ." (Italics added.) Patently the determination whether a particular occurrence is "covered hereunder" cannot be made until the claim against the insured has been resolved by adjudication or settlement: The language does not contain, and we conclude that it excludes, any basis for the kind of potentiality standard, found in cases construing duty-to-defend clauses, which would support FMC's contention that the London defendants should be obliged to pay defense costs as soon as incurred to defend against any claim even potentially covered by the policies. Nor is this case controlled by the theory of a duty of contemporaneous payment of defense costs developed in certain federal cases on the basis of the distinguishable language of directors and officers liability policies. (Cf. *Gon* v. *First State Ins. Co.* (9th Cir. 1989) 871 F.2d 863, 868; *Okada* v. *MGIC Indem. Corp.* (9th Cir. 1986) 823 F.2d 276, 280.)

At oral argument FMC accused the London defendants of asking us to rewrite their policies with respect to payment of defense costs. We are obliged to conclude that it is in fact FMC which seeks judicially to revise policies which impose neither a duty to defend nor, dispositively, a duty to pay defense costs before coverage has been established by judgment or settlement.

*Groundwater Issues at the Baltimore Site*

The eighth trial went to the jury only as to FMC's Baltimore site in Maryland and one other site.

At most of the sites involved in the eight trials in this matter, groundwater—broadly defined as water beneath the surface of the soil—was classified as third party property, for coverage purposes, whether or not the groundwater was located under FMC's property. Thus at such sites a jury, in determining whether there had been third party property damage within the meaning of the London policies, could consider damage to groundwater.

But at the Baltimore site the jury was not permitted to consider groundwater, either on or off the Baltimore site, for this purpose. The jury concluded that there had been no third party property damage at all during the

London defendants' pertinent policy periods, and on this basis the trial court denied coverage as to the Baltimore site.

On appeal FMC argues that it was error to remove groundwater damage from the jury's consideration, and that the error improperly circumscribed FMC's opportunity to prove third party property damage and thus its right to coverage under the London policies.

Factually, groundwater was clearly involved in the liability for which FMC sought coverage at the Baltimore site. The site adjoined Curtis Bay, off Chesapeake Bay. Over a period of many years FMC had produced and disposed of wastes on its site and the wastes had percolated into the underlying groundwater. The groundwater gradients were such that ground-water under the Baltimore site could be expected to migrate toward Curtis Bay. FMC's factual theory was that the groundwater did so migrate into strata under the bay and then upward through the strata into the sediments that lined the bay and into the bay waters themselves. Groundwater testing by means of wells on the Baltimore site near Curtis Bay disclosed, in the early 1980's, high levels of chemical substances which, if in fact they migrated into the bay waters and sediments in comparable concentrations, would have been toxic to certain forms of marine life. On this basis the Environmental Protection Agency (EPA) and state agencies required that FMC take steps to prevent migration of the groundwater from the Baltimore site toward and into Curtis Bay.

FMC sought coverage under the London policies for the cost of so much of the required environmental work as could be attributed to remediation of third party property damage attributable to an occurrence in the 1964-1970 policy periods. Of the several complex coverage issues thus raised, we are asked to consider only the trial court's treatment of groundwater under the Baltimore site and under the adjacent Curtis Bay.

1. *On-site Groundwater*

The Baltimore site was initially assigned to the sixth trial. In the early stages of trial preparation FMC assumed that it needed only prove damage to the groundwater under its site, and anticipated no difficulty in proving such damage. But in July 1996, two weeks before the sixth trial was to begin, FMC itself called to the attention of the trial court and counsel a three-year-old opinion of Maryland's highest court, *Bausch & Lomb* v. *Utica Mutual* (1993) 330 Md. 758 [625 A.2d 1021].

*Bausch & Lomb* addressed a dispute as to CGL insurance coverage for the cost to the insured of abating and remediating contamination in groundwater

beneath the insured's Maryland site. The Maryland Court of Appeals held, solely for purposes of resolving the coverage dispute, that the State of Maryland's broad regulatory power over groundwater "does not constitute a property interest within the contemplation of the insurance policy in dispute" and that "in the absence of third-party property damage" the insurer was not obliged to pay the insured's abatement expenses "incurred at the State's behest." (330 Md. at p. 788 [625 A.2d at p. 1036].)

FMC indicated a willingness to concede that, under *Bausch & Lomb*, as a matter of *Maryland* law on-site groundwater would not be third party property within the meaning of the London policies, but argued that the court should apply *California* law to what FMC characterized as an issue of insurance policy interpretation. Under California law, as declared by our Supreme Court at an earlier stage of this case, FMC "cannot be considered the owner" of on-site groundwater. (*AIU Ins. Co.* v. *Superior Court, supra*, 51 Cal.3d at p. 817, fn. 6.) The trial court accepted FMC's concession as to the effect of *Bausch & Lomb*, but implicitly rejected its choice-of-law argument, and ordered the Baltimore site off calendar to be reset for trial; ultimately the site was reassigned to the eighth trial.

The London defendants then moved for summary adjudication that they had no duty to indemnify FMC for liability at the Baltimore site. The London defendants based their motion on the parties' reading of *Bausch & Lomb*, arguing that "the evidence shows that FMC's liability relates solely to investigation and remediation of owned property—on-site soil and groundwater underneath the site." In response FMC did not discuss its earlier reading of *Bausch & Lomb* but simply argued that it could in fact prove liability, in the requisite sense, for third party property damage *off* the Baltimore site, "principally the Curtis Bay." In support of its argument FMC submitted a supplemental environmental report by its expert, Colpitts, in which Colpitts concluded that various contamination sources on the Baltimore site had in fact damaged off-site property in and under Curtis Bay. The trial court denied the London defendants' motion, finding a disputed issue of material fact as to FMC's liability on account of off-site third party property damage.

FMC never revisited *Bausch & Lomb* in the trial court. Throughout the eighth trial it focused on its asserted liability for environmental harm to third party property in and under Curtis Bay.

In this court, FMC for the first time shifts its position as to *Bausch & Lomb*, arguing that the case does *not* decide that a landowner owns the groundwater beneath its property and therefore does not establish that under

Maryland law the on-site groundwater was "property owned by the Named Assured" within the meaning of the exception to the London policies' definition of property damage. FMC also renews its choice-of-law argument, asserting that even were this court to conclude to the contrary it should then resolve the conflict between this perception of Maryland law and California's statutory rule that "[a]ll water within the State is the property of the people of the State . . . ." (Wat. Code, § 102; cf. *AIU Ins. Co.* v. *Superior Court, supra,* 51 Cal.3d at p. 817, fn. 6) in favor of California law under the choice of law rules of this California forum.

### a. *Choice of Law*

Before considering the significance of *Bausch & Lomb,* or of Maryland law generally, to the issue before us, we should turn to FMC's choice-of-law argument. If (as FMC asserts) this court should in any event apply California law, then we need not reach FMC's assertions as to *Bausch & Lomb.*

Were we to accept FMC's characterization of the underlying issue as one of policy interpretation we would be constrained to agree that the appropriate choice of law would probably be the law of California. (Cf., e.g., *California Casualty Indemnity Exchange* v. *Pettis* (1987) 193 Cal.App.3d 1597, 1605-1610 [239 Cal.Rptr. 205]; *Sentex Systems, Inc.* v. *Hartford Acc. & Indem. Co.* (C.D.Cal. 1995) 882 F.Supp. 930, 936-937.)

But in our view the ultimate issue is not one of policy interpretation but of property ownership. We perceive no real conflict as to the preliminary issue of policy interpretation: Clearly enough, the dispositive question under the London policies is whether FMC may be said to have owned the groundwater underlying its Baltimore site. The ultimate issue is the proper answer to the dispositive question, and that, we take it, is a matter which can rationally be characterized as at least analogous to a question of ownership or control of real property. ██ California's choice-of-law rule has been authoritatively stated and is in accord with what has been referred to as "the *universal* rule" (*Muth* v. *Educators Security Ins. Co.* (1981) 114 Cal.App.3d 749, 759 [170 Cal.Rptr. 849]): "[I]t is a fundamental principle of the law of conflicts that questions relating to control of real property are to be determined by the law of the jurisdiction in which the property is located." (*Wong* v. *Tenneco, Inc.* (1985) 39 Cal.3d 126, 136 [216 Cal.Rptr. 412, 702 P.2d 570]; cf. also *Barber* v. *Barber* (1958) 51 Cal.2d 244, 247 [331 P.2d 628]; 4 Witkin, Summary of Cal. Law (9th ed. 1987) Real Property, § 38, p. 255.) We perceive in the circumstances of this case no prejudice to the rights of the State of California or of its citizens, nor contravention of California's public policy, sufficient to dissuade us from applying the fundamental principle,

and thus Maryland law, to the question whether FMC owned the groundwater under its Baltimore, Maryland site. (Cf. *Muth* v. *Educators Security Ins. Co.*, *supra*, 114 Cal.App.3d at p. 759.)

### b. *Maryland Law*

We agree with FMC that in *Bausch & Lomb* the Maryland Court of Appeals did not hold that a landowner owns the groundwater beneath its land. So far as quoted in the opinion, the CGL policy in *Bausch & Lomb* did not incorporate a qualification to its definition of property damage analogous to the London policies' exception for "property owned by the Named Assured." The CGL policy had included a substantially broader "own property" *exclusion* of coverage for property owned by, occupied by, rented to, used by, or in the care, custody, and control of the insured, but it appears that this provision had been replaced by a negotiated provision for " 'own property' coverage" to a specified per-occurrence limit, although the "own property" exclusion may have remained in effect above that limit. (330 Md. at pp. 765, 771 [625 A.2d at pp. 1024-1025, 1027.) In any event the Court of Appeals rested its decision not upon the "own property" exclusion but upon its perception that CGL insurance characteristically insures against injury done to a third party's property and therefore "[t]he instant question of insurance coverage turns . . . on whether a third party has sustained injury to, or destruction of, its own property . . . ." (330 Md. at p. 783 [625 A.2d at p. 1033].) Thus, under its own perception of the issues, the Court of Appeals addressed only whether the *state* (apparently regarded by the court as the only relevant third party) owned the groundwater under the insured's site.

The Court of Appeals contrasted Maryland and California law: "Neither the Maryland Constitution nor any statute proclaims the State to be the owner of waters within its borders. This silence contrasts with the laws of many of the Western states, which explicitly confer ownership of water resources upon the State or its people. *See, e.g., AIU Ins.*[ *Co.* v. *Superior Court*], *supra*, [51 Cal.3d at p. 817, fn. 6] . . . ." (*Bausch & Lomb* v. *Utica Mutual*, *supra*, 330 Md. at p. 785 [625 A.2d at p. 1034].) The Court of Appeals went on to explain that such "power to preserve and regulate" groundwater as the state did reserve, under Maryland law, "does not constitute a property interest within the contemplation of the insurance policy in dispute." (330 Md. at p. 788 [625 A.2d at p. 1036].)

In sum the Maryland Court of Appeals decided that the state did *not* own the groundwater under the insured's site; it did not decide whether the insured *did* own the groundwater.

The Court of Appeals did discuss the landowner's interest in on-site groundwater, but only gratuitously on its way to a determination that it need not resolve the issue: "Two lines of authority apply to interests in groundwater. Under the older English Rule, the owner of the freehold was deemed to own absolutely all of the percolating waters beneath the surface of the land, just as he owned the soil and minerals beneath the surface and the air and sky above it. [Citation.] Under the more modern American Rule, the landowner is limited to a reasonable exercise of the owner's proprietary right in the water, i.e., such an exercise as may be reasonably necessary for some useful or beneficial purpose, before obstructing, diverting, or removing percolating water to the injury of a neighbor. [Citation.] [¶] While having suggested a preference for the American Rule [citations], this Court has never designated one rule or the other as the law of Maryland. There is no need to do so here. The common-law principles of groundwater were created to adjudicate disputes between neighboring property owners who claimed a right to use the waters beneath their lands. That is not the case before us now. The instant case concerns the nature and scope of the State's interest in the groundwater as it bears on the meaning of the standard CGL insurance policy." (*Bausch & Lomb* v. *Utica Mutual*, *supra*, 330 Md. at pp. 784-785 [625 A.2d at p. 1034], fn. omitted.)

In short the applicable Maryland law has yet to be firmly established.

Seizing upon the Court of Appeals' indication that it had previously "suggested a preference for the American Rule," FMC cites several cases under variants of the reasonable-use concept which have held that a right to make reasonable use of underlying groundwater is not tantamount to ownership of the groundwater for purposes of insurance policy language such as that before us. (Cf., e.g., *LaSalle Nat. Trust, N.A.* v. *Schaffner* (N.D.Ill. 1993) 818 F.Supp. 1161, 1169; *Maryland Cas. Co.* v. *Wausau Chemical Corp.* (W.D.Wis. 1992) 809 F.Supp. 680, 693, citing other federal and Wisconsin decisions.)

Even accepting FMC's assumption that Maryland courts would adopt "the American rule," we perceive room for argument that the coverage issue in this case should be resolved not by way of an essentially semantic distinction between ownership and a right of reasonable use but rather by evaluation of the relative rights to the groundwater in the overlying landowner and adjacent landowners under Maryland law, considered in light of the probable intent and purpose of the policy language as determined under California law.

But we will not address these interesting issues in this case. We conclude that the issue of ownership of the underlying groundwater must be left as

FMC chose to leave it throughout the trial court proceedings after *Bausch & Lomb* came to light: We will not disturb the assumption of the trial court and counsel, at trial, that within the meaning of the London policies FMC owned the groundwater under the Baltimore site.

We reach our conclusion by synthesis of two considerations.

First, the Maryland Court of Appeals clearly recognized alternative theories of interests in groundwater, and while it acknowledged a previous suggestion of preference for the American rule it explicitly elected not to choose between the two and thus implicitly left the alternative English rule available for further consideration under Maryland law.

Second, as this court has recognized, as a general rule " '[a] party is not permitted to change his position and adopt a new and different theory on appeal. To permit him to do so would not only be unfair to the trial court, but manifestly unjust to the opposing litigant.' " (*Estate of Stevenson* (1992) 11 Cal.App.4th 852, 865 [14 Cal.Rptr.2d 250], quoting from *Ernst* v. *Searle* (1933) 218 Cal. 233, 240-241 [22 P.2d 715]; cf. also *Sommer* v. *Gabor* (1995) 40 Cal.App.4th 1455, 1468 [48 Cal.Rptr.2d 235]; *North Coast Business Park* v. *Nielsen Construction Co.* (1993) 17 Cal.App.4th 22, 28-29 [21 Cal.Rptr.2d 104]; *Resolution Trust Corp.* v. *Winslow* (1992) 9 Cal.App.4th 1799, 1810 [12 Cal.Rptr.2d 510].) FMC argues that the issue is purely one of law, and that the parties' initial acquiescence in a reading of *Bausch & Lomb* with which FMC now seeks to disagree may be characterized, in essence, as a mutual mistake of law, and that in either event this court is not barred from considering the issue and reaching a different result. But FMC does not and cannot disagree with the proposition that the decision whether to reopen the issue is, in these circumstances, within our discretion.

We choose to exercise our discretion *not* to reopen the issue primarily because we perceive that FMC's presumably conscious decision to take the initial position it did with respect to *Bausch & Lomb* caused significant changes in the way the case as to the Baltimore site was prepared and tried: Significant alteration of the trial court's ordering of trial sites and trials; major alterations in trial preparation and pretrial motions; trial upon factual premises and evidence which might never have been raised or presented but for FMC's reading of *Bausch & Lomb*. The potential prejudice to both the courts and the opposing litigants implicit in retrying the matter to accommodate FMC's change in position is manifest simply in terms of time and money.

Nor is this a case in which we can justify the change of position, and new proceedings to accommodate FMC's desire to exploit its new position, by

way of perceptions *both* that FMC's initial position was wrong *and* that FMC's election to take that position was nevertheless excusable in all the circumstances.

It is by no means clear to us that FMC's initial position was wrong, or indeed anything more than a conscious tactical choice between viable alternatives. *Bausch & Lomb* left the English rule in play; if for tactical reasons FMC chose to assume that the English rule would prevail (or even that under the American rule this or another court would rule against FMC) and thus that FMC would ultimately be held to be the owner of the underlying groundwater, and if FMC permitted the trial to proceed on the basis of that tactical assumption, then it is entirely fair to expect FMC to live with the result.

And FMC suggests no predicate whatsoever for a conclusion that it took its initial position by means of anything less than a conscious tactical choice.

### 2. *Off-site Groundwater*

In her supplemental report submitted in opposition to the London defendants' motion for summary adjudication, Colpitts described the process of groundwater migration offsite and concluded as to various contamination sources on the Baltimore site that (for example, as to a site described as "the landfill") "[g]roundwater [under the site] was impacted by a mixture of organic and inorganic substances placed in the landfill. In addition, because groundwater naturally discharges off-site to Curtis Bay, it follows that the groundwater below the bay, sediment in the bottom of the bay, and the surface water comprising the bay, were all impacted by the subsurface migration of chemicals to off-site areas. In my opinion, the migration of landfill chemicals through groundwater off-site and into the Bay caused off-site property damage in each of the years 1964 to 1970."

In denying the London defendants' motion, the trial court explicitly referred to off-site groundwater, reciting that "there is a disputed issue of material fact whether plaintiff's liability for damages at the site is on account of third-party property damage (bay groundwater, sediment, and bay waters) occur[r]ing during the 1964-1970 policy periods."

In the course of pretrial motions for the eighth trial FMC was obliged to particularize its claim for off-site third party property damage. Counsel for FMC conceded that Colpitts would be unable to give an opinion as to specific levels of contaminants off-site, and that it had no direct evidence, such as bay water samples or "an autopsy of a fish," of property damage in

Curtis Bay. Counsel argued that damage to the bay could be *inferred* from empirically determined levels of toxic chemicals in the on-site wells, relying on official conclusions that once the toxic levels exceeded given standards the contamination, if not controlled, would cause damage in the bay.

Throughout these proceedings the parties, evidently following the lead of the regulatory agencies, articulated "damage" in Curtis Bay in terms of injury to marine organisms. Counsel for FMC appeared to regard the groundwater in strata underlying Curtis Bay primarily as a conduit between on-site contamination sources and the waters and sediments of Curtis Bay. And he represented to the court that "We're not saying that the mere presence of chemicals constitutes property damage."

But then, after preinstruction and immediately before opening statements, counsel for FMC reasserted a claim for damage to all "property off site," including off-site groundwater. When the trial court suggested that FMC's attorneys had previously "abandoned any effort to prove bay groundwater as third-party property that was damaged," counsel for FMC responded that "[t]he groundwater is the conduit. . . . But the groundwater is damaged because this pollution is going through it off site into the bay."

Then counsel for FMC appeared to return to the position that damage should be defined in terms of injury to marine organisms: "[T]he damage to third-party property that is at issue in this case is damage to life in the bay and life in the bay sediments due to the migration of contaminated water into third-party property. [¶] . . . [¶] I am going to seek to prove that third-party property is property not owned by FMC. . . . And the damage we have caused to that third-party property is the migration of contaminants exceeding the biotoxicity or ambient levels and thereby presumptively causing damage to aquatic life in the third-party property."

In his opening statement counsel for FMC spoke of "damage, potential damage, presumptive damage to aquatic organisms that live out there in the sediments in the bay." He did not specify damage to off-site groundwater, in the strata underlying Curtis Bay, as such.

Throughout the last several trials the trial court permitted counsel to make short "witness summaries" or "miniopenings" from time to time, to help the jury focus on the next witness or group of witnesses. Before Colpitts testified at the eighth trial, counsel for FMC told the jury that Colpitts had been hired "to determine whether there was off-site damage from the migration of contaminated groundwater, off-site damage to the bay and to life in the bay . . . ."

Colpitts testified, consistent with her supplemental report, that off-site property damaged by migration of contaminated groundwater from the Baltimore site "would have been the groundwater underneath Curtis Bay, as well as the sediments . . . and the surface water of the bay." Counsel for FMC asked her: "Within the groundwater that you've just described off-site . . . , is there life form or potential life form that you believe has also been damaged or harmed by the off-site migration of contaminated groundwater?" Colpitts answered "Yes, there is," but as counsel sought to follow up the London defendants objected that Colpitts was not qualified to express opinions on the subject, and after voir dire and colloquy the trial court sustained the objections and instructed the jury to disregard any opinion of Colpitts's "as to any damage to groundwater life forms or potential life forms off-site." Counsel for FMC did not pursue the subject of harm to marine life in the groundwater, and the issue has not been raised on appeal.

But later in her testimony Colpitts reiterated that, based on the data she had reviewed, "the off-site groundwater, sediments, and life in the sediments were damaged." The court asked: "What was the damage to the groundwater?" Colpitts replied: "The presence of chemicals being in the groundwater, in my opinion, would have damaged the groundwater." Counsel for FMC undertook to clarify the point: "When you say . . . the presence of chemicals in the groundwater, do you mean any amount or do you mean at these elevated levels?" Colpitts replied: "At these elevated levels, yes."

The London defendants' expert conceded that chemicals from the Baltimore site were currently moving off-site through the groundwater, but felt it was not "proper to draw a conclusion that [there was harm or damage] in the '60's based on the information we have from the '80's and '90's and the changes that occurred since the '60's."

FMC requested a jury instruction that at the Baltimore site "the third party property . . . at issue is groundwater, sediments, or surface water outside the site's property boundaries." The trial court's rulings on instructions appear to have been made off the record, but the court marked the requested instruction "Reject." The court instructed the jury, instead, that "At the Baltimore site . . . third party property includes Curtis Bay and its sediments. [¶] . . . [¶] . . . [A]t the Baltimore site, property damage means damage or harm to off-site bay waters and sediments resulting from contaminated groundwater migrating off-site from [specified] on-site facilities." The court subsequently changed the instruction to substitute "bay waters or sediments" for "bay waters and sediments" in the second quoted sentence, and read the modified sentence to the jury.

In summations, counsel for FMC referred in pertinent part only to "off-site bay waters or sediments."

After summations, counsel for FMC, apparently seeking to make a record of what had previously transpired off the record, asserted that the court "should say nothing more than third party property and should not define it," or, alternatively, "if you're going to define it as to the Baltimore site, it should not be limited to sediments but should have included, at a minimum, the groundwater off-site . . . ." Counsel argued that "the groundwater is third party property as it leaves the site. And that F.M.C.'s liability at the site should stop the spread of contamination in the groundwater so that that groundwater, as it leaves the site, is third party property which is highly contaminated with chemicals and therefore is damaged." "The mere fact that that groundwater ultimately ends up in the sediments I don't think changes its character as having been damaged or changes its character as third party property. It's really no different than any other site in this case."

The trial court responded that "[t]his was not in the case. You had not asserted groundwater, off-site groundwater as property damage. The only connection was . . . that there was contamination migrating off-site, but you never contended that third party property in this case included groundwater without life in the groundwater."

On appeal FMC asserts that the trial court erroneously refused to instruct on FMC's theory, assertedly supported by substantial evidence, that there had been damage to off-site groundwater independent to harm to marine organisms, and that the error requires reversal under cases such as *Fish* v. *Los Angeles Dodgers Baseball Club* (1976) 56 Cal.App.3d 620, 641 [128 Cal.Rptr. 807, 91 A.L.R.3d 1], or *Soule* v. *General Motors Corp.* (1994) 8 Cal.4th 548, 574 [34 Cal.Rptr.2d 607, 882 P.2d 298].

The point has been exhaustively briefed. Each side urges us to consider record passages, only a portion of which are quoted above, that assertedly support their respective assertions that FMC did, or did not, rely on a theory of damage to groundwater under Curtis Bay independent of harm to any microorganisms that may have been in the groundwater.

The point is not free from doubt, although, if this was in fact FMC's theory, in our view FMC did not make the theory clear in the trial court. Certainly its presentation appeared to vacillate.

But there is a shorter answer. A trial court is not obliged to, and indeed should not, instruct on a theory which is *not* supported by evidence. (Cf., e.g., 7 Witkin, Cal. Procedure (4th ed. 1997) Trial, § 318, pp. 362-363.) Here, by virtue of the trial court's unchallenged ruling excluding Colpitts's proposed testimony as to microorganisms in the groundwater, there was no

evidence to support (as to the groundwater) FMC's only clearly stated theory: that damage or harm to third party property meant, in the circumstances of this case, injury to marine organisms. FMC's only alternative theory, explicitly disavowed before trial and apparently not raised again until colloquy on instructions, was that the mere presence of toxic chemicals in the groundwater, en route from the Baltimore site to the Curtis Bay sediments and waters, constituted damage, in the requisite sense, to the groundwater. Colpitts so testified, but her testimony was a matter of her own opinion and its substantiality was vitiated by her acknowledgment that her assumptions as to the concentration, and even the presence, of chemicals once they had left the site were necessarily based entirely on inference from on-site measurements.

In these circumstances the trial court properly declined to authorize the jury to find third party property damage to the groundwater under Curtis Bay.

### Procedural and Evidentiary Issues

#### *Imputation of Employee Knowledge*

Many current and former FMC employees, almost all of them from the rank and file, testified at the several trials. On appeal from the fourth, fifth, and sixth trial "judgments," FMC complains of jury instructions which (in FMC's view) required the jury to impute the knowledge of FMC employees to the corporation in specified circumstances.

At the fourth trial the trial court instructed the jury as follows: "As against plaintiff as an employer, both employer and its employee are deemed to have notice and knowledge of whatever either has notice or knowledge of, and ought in good faith and in the exercise of ordinary care and diligence to communicate to the other. And this is so whether plaintiff's employee communicated knowledge to the plaintiff or not, so long as the employee acquired the knowledge while acting in the course and scope of his or her employment with plaintiff."

At the fifth trial the court gave the following instruction: "[A]s against plaintiff as an employer, the employer is deemed to have notice and knowledge of whatever its employee has notice or knowledge of and ought in good faith and in the exercise of ordinary care and diligence, to communicate to the employer, so long as its employee acquired the knowledge while acting in the course and scope of his or her employment."

At the sixth trial the court instructed as follows: "Knowledge which a corporation's employee receives or has in mind when acting in the course of

his or her employment is in law the knowledge of the corporation, if such knowledge concerns a matter within the scope of the employee's duties."

FMC argues that these instructions improperly undercut *Shell*'s test for "expected" damage—"whether the insured knew or believed its conduct was substantially certain or highly likely to result in that kind of damage" (*Shell Oil Co.* v. *Winterthur Swiss Ins. Co., supra,* 12 Cal.App.4th at p. 748)—by authorizing the juries to *impute* rank-and-file employees' knowledge or belief to the corporation without requiring proof at least that the knowledge or belief was possessed by high-level corporate managers. FMC acknowledges that "[t]he insurers can argue that 'corporate knowledge' *may be* inferred from evidence of the knowledge of employees at any level of the corporate hierarchy. It is wrong, however, to instruct the jury that as a matter of law they are *required* to draw that inference."

FMC's suggested distinction between inferences and conclusive presumptions is colorable but does not reach the crux of the problem the trial court undertook to solve: the truism that a corporation, as such, cannot know, or believe, or intend, and that its knowledge, belief, or intent *must* ultimately be the knowledge, belief, or intent of the people—the officers, managers, and employees—who link the corporate abstraction to the real world.

FMC's solution would be to impute relevant knowledge to the corporation itself only if the knowledge could be shown (in the words of *Turner* v. *Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238 [32 Cal.Rptr.2d 223, 876 P.2d 1022], on which FMC relies) to "exist on the part of . . . those persons who effectively represent the [corporation], i.e., its officers, directors, managing agents, or supervisory employees." (7 Cal.4th at p. 1251.)

The trial court could reasonably have concluded that FMC's solution would not take sufficient account of the practicalities of this matter. The *Turner* case on which FMC relies involved asserted wrongful constructive discharge of an employee, and the policy context of the constructive discharge theory of liability, as well as the perception that it would be the offended employee who would be expected to bring the matter to the attention of appropriate representatives of management, serve to distinguish that case from this one. Here all of the people, at whatever level, whose knowledge might have been or become the knowledge of FMC for purposes of the "unexpectedly" issue were as a practical matter subject to the control of the corporation; there was no one to play a role analogous to that of the offended employee and thus to provide a practical means of assuring that top management would receive the relevant information, or of minimizing the risk that self-interest would lead top management to deny knowledge it in fact had.

It was FMC's burden to show that third party property damage had been unexpected. To bear its burden FMC called a number of current and former employees to testify, in essence, that they had *not* expected damage. The trial court's instructions neither told the jurors to discount such testimony nor authorized them to prefer the countervailing testimony of employees who admitted having had relevant knowledge. The trial court simply established what might be called a bright-line rule, to avoid the complexities of determining which of various middle or high level managers might, or might not, be said to "effectively represent" FMC for this purpose. Nor did the trial court prevent FMC from calling such managers as witnesses and allowing the jurors to gauge their credibility and to weigh their testimony against any inconsistent testimony from lower level employees.

That the parties and the jurors were able to work within the trial court's framework is strongly suggested by the fact that at three of the nine sites that went to verdict at the fourth, fifth, and sixth trials the jurors concluded that the third party property damage had been unexpected and thus, implicitly, that FMC had borne its burden.

Better solutions to the problem might have been devised, but in the circumstances of record the instructions the trial court gave were permissible.

### Exclusion of Testimony Regarding Baltimore Site

FMC complains of several rulings that excluded witnesses or limited their testimony with respect to the Baltimore site at the eighth trial.

### 1. Preslo

FMC asserts that the trial court abused its discretion by refusing to allow FMC to call an expert witness named Lynne Preslo.

The London defendants had designated Preslo as an expert witness for the sixth trial, to which the Baltimore site was initially assigned. The Baltimore site was then moved from the sixth trial to the eighth trial. The London insurers did not redesignate Preslo for the eighth trial. FMC then sought to designate Preslo as its own expert, but not until after the designation deadlines set by the trial court's case management orders. FMC invoked subdivision (m), clause (1) of Code of Civil Procedure section 2034, which provides that a party may call an expert not previously designated by that party if "that expert has been designated by another party and has thereafter been deposed under subdivision (i)" (relating to depositions of designated experts).

The London defendants moved *in limine* to exclude Preslo's testimony, arguing that they had not designated Preslo for the *eighth* trial and that her testimony would not be relevant and would confuse and mislead the jury. It appeared that Preslo had been deposed by FMC, as one of the London defendants' designated expert witnesses for the sixth trial, but had not been redeposed for the eighth trial. The parties disputed whether, in the circumstances of this action, the sixth and eighth trials should be regarded for purposes of the statute as wholly distinct trials or simply as separate phases of a single trial. The trial court granted the London defendants' motion to exclude Preslo's testimony, basing its order both on the statute and on its perception that FMC's belated designation had been "a clear manipulation of my orders . . . [as to] the manner in which these cases would be tried." The court did not reach the relevance issues.

On appeal FMC argues that the trial court "misused [its] case management powers" to deviate from the statutory procedure and asserts that FMC complied with the statutory procedure, renewing its trial-court contention that the eighth trial had not been "a 'new trial' superseding all prior discovery activities and deadlines." FMC adds an assertion that in basing its ruling in part on what it considered "manipulation" of its orders the trial court had effectively imposed an unauthorized evidence preclusion sanction.

We conclude that the trial court's case management orders were proper and enforceable apart from technical distinctions between "trials" and "phases" of trials, that no adequate reason appears for FMC's failure to designate Preslo for the eighth trial in accordance with the case management orders, and that the trial court's ruling was within the scope of its inherent power to control the proceedings before it.

### 2. *Freiheiter*

FMC proposed to call as a witness Michael Freiheiter, a federal EPA scientist who had written a corrective action permit requiring FMC to take steps to correct environmental contamination emanating from the Baltimore site. FMC sought by Freiheiter's testimony to establish that the EPA's motivation had been to remedy past harm (which arguably would have been subject to coverage under the London policies) rather than simply to avert future harm (which, as a "prophylactic measure," would not have given rise to covered "damage" in light of *AIU Ins. Co.* v. *Superior Court, supra,* 51 Cal.3d at page 843). The London defendants moved to exclude Freiheiter's testimony on the ground that "he lacks the foundation to testify regarding the EPA's intentions (point of view) regarding FMC's liability at the site . . . ." The trial court excluded Freiheiter's testimony, later reciting for the record

that it had done so on essentially the grounds suggested by the London defendants.

On appeal FMC argues that the trial court's ruling constituted a misapplication of the parol evidence rule. We find in the record no indication that the London defendants asserted, or that the trial court relied on, the parol evidence rule. FMC does not plausibly suggest why the trial court's ruling was not supported by the grounds on which the court did rely. We find no error.

### 3. *Mickam, Murphy and Dean*

FMC proposed to call two scientists (James Mickam and Cornelius Murphy) employed by FMC's remediation consultant and an FMC environmental engineer (Parker Dean) directly responsible for remedial activities at the Baltimore site, none of whom had theretofore been designated as expert witnesses. At the London defendants' request FMC was required to make an oral offer of proof as to what each would say. The London defendants then moved, in essence, to limit the testimony of these three witnesses to matters they had perceived and to preclude opinion testimony from any of them, and the trial court in essence granted the London defendants' motion. FMC then moved to augment its expert witness list to add Mickam, Murphy and Dean; the motion was denied.

Mickam, Murphy and Dean all testified at trial, but the trial court would not permit them to state what it perceived to be opinions.

On appeal FMC argues that the trial court "erred in excluding, as undisclosed 'expert' testimony, . . . opinions developed [by the three witnesses] during their hands-on involvement in the contaminant characterization and remedial treatment feasibility studies" at the Baltimore site. Specifically FMC argues that the trial court erred in denying its motion to add Mickam, Murphy and Dean to its expert witness list and, in any event, by excluding the witnesses' opinions as to matters rationally based on their perception, and helpful to a clear understanding of their testimony, within the meaning of Evidence Code section 800.

Each of these rulings was entrusted to the trial court's sound discretion. We find no abuse of discretion on the record before us.

### *Circumstantial Evidence of Knowledge or Belief*

FMC sought to present circumstantial evidence of acts and events in the 1960's that would be, in FMC's view, "consistent with an absence of

expectation of groundwater pollution," and which would thus tend to corroborate testimony of FMC witnesses at trial in the 1990's that they had not believed FMC's various waste-disposal techniques would result in environmental contamination. The trial court excluded much of FMC's circumstantial evidence, and on its appeals following the fourth, fifth, and sixth trial judgments FMC assigns the exclusions as error in three categories. The London insurers take the position that in each instance the rulings were correct or that any error was otherwise vitiated.

## 1. *Loss Prevention Personnel*

From time to time Liberty Mutual had sent "loss prevention" personnel to FMC sites to evaluate, and to attempt to minimize, risks of liability that would fall within Liberty Mutual's coverage. FMC undertook to prove that these loss prevention inspectors had not contemporaneously called to FMC's attention defects in FMC's handling of toxic wastes which were later made the basis for assertions of liability against FMC. The trial court excluded the evidence. The issue was directly presented at the fourth trial, at which the court expressed doubt as to the probative value of the evidence and concluded that "if it were relevant, it would be so marginally relevant as to be outweighed by the prejudicial effect and undue consumption of time and confusion of the issue. The evidence is clearly inadmissible." And at the fifth trial, where FMC sought to present similar evidence for a site as to which it ultimately obtained a favorable verdict and a coverage judgment, the trial court reiterated that "[t]he whole point is [Evidence Code section] 352. . . . [I]f you had evidence that they actually scrutinized your specific conduct that resulted in the property damage, then the probative value goes way up and tends to offset the consumption of time required to prove that kind of knowledge. [¶] You don't have that evidence, so the probative value is very slight and it's outweighed by the consumption of time and the prejudicial effect."

We agree with the trial court's approach to this issue, and conclude on the record before us that the court's invocation of Evidence Code section 352 was well within the scope of its sound discretion.

## 2. *Virginia State Water Control Board*

Similarly, officials of the Virginia State Water Control Board had visited FMC's Front Royal, Virginia, site and had inspected certain of FMC's waste disposal facilities, for regulatory purposes. FMC undertook to prove that these officials had made no negative comment or report. The trial court excluded the evidence, again on both relevance and Evidence Code section 352 grounds, and again we conclude that there was no abuse of discretion.

### 3. *FMC Reaction to Known Problems*

FMC also undertook to prove that it had paid "substantial sums" to remedy "known environmental threats" at a site assigned to the fourth trial, upon the theory that "the jury could have inferred that FMC would have been willing to spend money to prevent other environmental threats if it knew about them." Again the trial court excluded the evidence, and again its ruling was well within its sound discretion: The tendency of such evidence to confuse the issues clearly outweighed its problematic probative value.

### *"Environmental Criminal"*

On its appeals following the fourth and sixth trial "judgments" FMC asserts that the trial court improperly allowed the London defendants "to portray FMC as an environmental criminal" by introducing various kinds of evidence concerning incidents on occasions or at sites other than those currently on trial and in one instance by displaying a book (previously mentioned but not received in evidence) to the jury during summation.

### 1. *Knowledge of Mismanagement After 1970*

FMC asserts that at the fourth trial the trial court improperly admitted evidence that FMC employees were aware of instances of mismanagement of toxic wastes *after* the end of the relevant policy periods in 1970. The crux of FMC's argument in this court, for which it cites *Genrich* v. *State of California* (1988) 202 Cal.App.3d 221, 228-229 [248 Cal.Rptr. 303], and *Larson* v. *Solbakken* (1963) 221 Cal.App.2d 410, 419 [34 Cal.Rptr. 450], is its assertion that evidence of events and state of mind *after* a point in time can never be probative of knowledge or other state of mind *at* that point in time. FMC's generalization is considerably broader than *Genrich* and *Larson*, and is also inconsistent with its position in the trial court, which was to agree "in the abstract" with the London defendants' argument that evidence of subsequent knowledge could be probative of earlier knowledge but to argue that the particular evidence offered in these instances was not probative. FMC's position at trial was consistent with orthodox relevance analysis, under which the question whether particular evidence has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action" must be answered case by case. (Cf. 1 Witkin, Cal. Evidence, *supra*, Circumstantial Evidence, §§ 309, 393, pp. 278-280, 366-367.) We find no reason in law or policy to apply a categorical rule of exclusion in these circumstances, and we cannot find fault with the trial court decision to admit the specific evidence of which FMC complains.

### 2. *Groundwater Contamination at Other Sites*

FMC asserts that at the fourth and sixth trials the trial court improperly admitted evidence of groundwater contamination problems at FMC sites

other than those assigned to the current trial, unsupported by a showing of substantial similarity in conditions between the trial sites and the remote sites.

In proceedings preliminary to both trials, the London defendants had tendered evidence of the contemporary awareness of FMC employees, in general or in reference to sites other than those assigned to trial, of the mechanics and risks of groundwater contamination, essentially for two closely related purposes: As some circumstantial evidence of FMC's awareness *at* the trial sites, and to rebut FMC's anticipated claim that it was *not* aware either generally or at the trial sites. FMC responded that the evidence was irrelevant and in any event unduly prejudicial. After lengthy hearings and subsequent supplemental offers of proof the trial court admitted some but not all of the evidence the London defendants had tendered.

In this court FMC again adopts what amounts to a black-or-white position, arguing in essence that absent a showing of substantial similarity between trial sites and nontrial sites, evidence derived from nontrial sites should not have been admitted. Again, FMC's authorities do not support so broad a rule. Again its considerably less categorical position in the trial court was more consistent with the law. Patently the evidence had some tendency in reason to support the inferences the London defendants sought. Actual state of mind can (and often as a practical matter must) be proved by circumstantial evidence. (Cf. *Landeros* v. *Flood* (1976) 17 Cal.3d 399, 415, fn. 13 [131 Cal.Rptr. 69, 551 P.2d 389, 97 A.L.R.3d 324]; *Oil Workers Intl. Union* v. *Superior Court* (1951) 103 Cal.App.2d 512, 533 [230 P.2d 71]; 1 Witkin, Cal. Evidence, *supra*, Circumstantial Evidence, § 408, pp. 381-382.) We are satisfied that the trial court properly weighed both relevance and potential prejudice, and ruled correctly in the circumstance of record.

### 3. *Carbamate Contamination*

FMC purchased facilities at the Front Royal site, from American Viscose Corporation, in 1963; many American Viscose employees became FMC employees. In 1958 and 1959, fish in the adjacent Shenandoah River had been killed by a toxic substance, zinc dimethyldithiocarbamate or "carbamate," generated in American Viscose's wastewater treatment plant. American Viscose undertook, and FMC continued, steps to control the release of carbamate, but neither company reported the release to regulatory authorities.

At the fourth trial (to which the Front Royal site was assigned) the London defendants proposed to introduce evidence of the carbamate release, and of

the companies' failure to report it, primarily upon the theory that the evidence "tends to rebut testimony from FMC witnesses that plant personnel were always forthright and fully cooperative with regulatory officials," a position FMC assertedly had taken in support of "its position on expectation of damage." FMC sought to exclude the London defendants' evidence as "clearly irrelevant" to the groundwater contamination (by substances other than carbamate) for which FMC sought liability coverage, arguing that the evidence was being tendered "to smear F.M.C., because the same employees that were involved in the carbamate situation at A.V.C. became employees at F.M.C."

The trial court denied FMC's motion to exclude the evidence "with respect to intent and knowledge." Both sides referred to the carbamate evidence in opening statements; the evidence was received; both sides argued the evidence in summation. The jury concluded that groundwater damage at Front Royal had not been unexpected from FMC's standpoint, and on that basis the trial court denied coverage at Front Royal.

On appeal FMC renews its arguments that the carbamate evidence was irrelevant and unduly prejudicial. The London defendants respond that the evidence was relevant to impeach the videotaped deposition testimony of three former American Viscose/FMC employees, all of whom were questioned primarily as to their expectation of groundwater damage but who also denied knowledge of the cause of the fish kill or of the toxic nature of carbamate. FMC replies that the asserted impeachment was improperly directed to collateral matters; it appears from the record that in each instance the testimony relevant to fish kills or carbamate was in deposition excerpts selected and presented by the London defendants rather than by FMC, and the testimony of one of the three witnesses was tendered only by the London defendants.

We conclude that rulings on these issues were necessarily addressed to the trial court's discretion (cf. generally, 1 Witkin, Cal. Evidence, *supra*, Circumstantial Evidence, § 309, pp. 278-280; 3 Witkin, Cal. Evidence, *supra*, Introduction of Evidence at Trial, § 1983, pp. 1939-1941), and although the questions of admissibility, if addressed to us in the first instance, would have been close, we cannot conclude that the trial court abused its discretion.

4. *South Charleston*

FMC anticipated that one of its "key percipient witnesses regarding the Front Royal site" at the fourth trial would be a former employee of both American Viscose and FMC named Ernest Ladd.

Before trial the London defendants indicated that they would undertake to prove that in 1975 the EPA had asked FMC to provide data relating to carbon tetrachloride discharge from FMC's South Charleston, West Virginia, site, that Ladd, acting for FMC, had grossly underreported the relevant data, that a federal grand jury had subsequently indicted Ladd, a second employee, and FMC itself for the underreporting, and that FMC had pled guilty to the federal charges and the indictments were then dismissed as to Ladd and the second employee. The London defendants' theories of admissibility were that the evidence would rebut any suggestion by FMC that it invariably cooperated fully with federal environmental agencies, and would also tend to impeach Ladd's credibility. The London defendants also argued that evidence of the handling of the South Charleston discharges and of the earlier carbamate discharges at Front Royal, together with other evidence, would tend to rebut FMC's evidence that the groundwater damage at Front Royal had been unexpected within the meaning of the occurrence definition.

FMC moved to exclude the evidence in three categories: the subsequently dismissed indictment of Ladd, FMC's guilty plea, and the events underlying both the indictments and the guilty plea. The trial court granted FMC's motion as to the indictment and FMC's guilty plea, but concluded that the underlying facts "appear[] to be more probative than prejudicial. The motion to suppress those facts is denied with respect to the limited purpose of intent and knowledge." Ladd ultimately decided not to testify at the fourth trial, effectively mooting the contention that any of the evidence would also have been relevant to Ladd's credibility as a witness.

At trial the London defendants undertook to prove the underlying facts by means of excerpts from the videotaped deposition of former FMC board chairman, president, and chief executive officer Robert Malott. In the excerpts Malott for the most part denied specific recollection of the South Charleston underreporting, but he did acknowledge it with enough specificity to indicate that he was aware it had occurred and that Ladd had been involved in it. As displayed to the jury, the deposition had been edited to remove words, such as "criminal" and "indictment" and "pleaded guilty," which would directly connote criminal activity or criminal charges or the fact that FMC had pled guilty to such charges, but retained the words "charges"—"Q. Are you aware of the [the word "criminal" was deleted] charges that were lodged against FMC . . . ?"—and "charged"— "A. The fact that they were charged with having withheld information that was available to them . . . ."

In its briefing on appeal FMC challenges the relevance of Malott's deposition excerpts only in its reply brief and only in response to the London

defendants' puzzling assertion that the excerpts were "directly relevant to attack . . . Ladd's credibility." FMC's primary briefed assertion is that even as edited the excerpts were unduly inflammatory, and that the trial court should have excluded them (presumably under Evidence Code section 352) on that ground. Once again, this is an issue entrusted primarily to the trial court's discretion, and we find no abuse of discretion.

At oral argument FMC suggested in general terms that the South Charleston evidence was remote in time and not probative of any material issue. We conclude that the trial court's pretrial determination that the evidence (implicitly as viewed in the context of other anticipated evidence) would be at least circumstantially probative of "intent and knowledge" is sufficiently supported by the record before us.

### 5. Altered Report

FMC asserts that the trial court improperly admitted evidence that at FMC's Middleport, New York, site (which was never tried, and assertedly was dissimilar to the trial sites), after the end of the relevant policy periods, FMC had commissioned a wastewater treatment report for state regulators but then had withheld the report (despite repeated state requests for such a report) and had submitted a second report, several months later, which eliminated the first report's references to groundwater contamination on the site. These were the so-called Weston reports. The London defendants' theory of admissibility was that the evidence rebutted FMC management's professed ignorance of environmental contamination and its professions of candor with regulatory agencies. FMC challenges the relevance of the evidence for either purpose, pointing out not only that the Middleport site was dissimilar but also that the incident had occurred after the end of the relevant policy periods. Again FMC is arguing from tenuous generalizations based on cases such as *Genrich* v. *State of California, supra,* 202 Cal.App.3d at pages 228-229, and *Larson* v. *Solbakken, supra,* 221 Cal.App.2d at page 419. The trial court's finding that the Weston reports evidence was sufficiently probative and not unduly prejudicial is supported by the record.

### 6. Delayed Report

FMC asserts that the trial court improperly admitted evidence that FMC had delayed reporting a known incident of environmental contamination, at the Pocatello site assigned to and disposed of at the fifth trial, from 1970 (when the incident came to light) until 1972. This was the so-called Pilot House Cafe incident. FMC's arguments are similar to those it made with respect to the evidence concerning the Middleport site, and our conclusion is the same.

### 7. *Silent Spring*

FMC asserts that the trial court improperly permitted counsel for the London defendants to display to the jury, during summation, excerpts from Rachel Carson's book, Silent Spring (1962), concerning environmental harm caused by widespread use of chemical pesticides.

The London defendants had tendered excerpts from the text of Silent Spring as evidence, but the trial court excluded the excerpts. It appears that what the jury saw during summation were not these text excerpts but, instead, two pages from the book's "List of Principal Sources" which enumerated various publications and hearing transcripts cross-referenced to text pages. In each of two instances, counsel for the London defendants reminded the jury that particular FMC witnesses had asserted, in substance, that Silent Spring was not scientifically based, and then, on cross-examination, had been confronted with these listings of "Principal Sources." With prior leave of court, counsel then showed the pages to the jury "as a visual aid[]" or "for illustrative purposes only," reminding the jurors that the pages were "not in evidence."

FMC argues that the use of the listings was misleading, in that "[t]he lay jury was not capable of properly evaluating Silent Spring's 'List of Principal Sources' as a check on the credibility of FMC's witnesses . . . ." But the jurors were not called upon to evaluate the pages, which (as they were explicitly reminded) were not in evidence. What they were called upon to evaluate were the witnesses' reactions to the pages in the course of cross-examination. In and of themselves the pages are innocuous; the ruling which permitted the jurors to see the pages was within the scope of the trial court's sound discretion.

### DISPOSITION

The final judgment in this matter consists of the following eight documents:

The document titled "Judgment on Six Sites (New)," filed October 25, 1994 (hereafter Document (1)).

The document titled "Judgment on Six Sites (Second Trial)," filed January 2, 1996 (hereafter Document (2)).

The document titled "Judgment on Seven Sites (Third Trial)," filed March 4, 1996 (hereafter Document (3)).

The document titled "Judgment on Six Sites (Fourth Trial)," filed August 1, 1996 (hereafter Document (4)).

The document titled "Judgment on Five Sites (Fifth Trial)," filed January 22, 1997 (hereafter Document (5)).

The document titled "Judgment on Four Sites (Sixth Trial)," filed February 14, 1997 (hereafter Document (6)).

The document titled "Judgment on Four Sites (Seventh Trial)," filed February 21, 1997 (hereafter Document (7)).

The document titled "Judgment on Six Sites (Eighth Trial)," filed May 28, 1997 (hereafter Document (8)).

As so defined, the judgment is modified as follows:

a. In Document (2), *delete* the paragraph that begins at the bottom of page 18, following the numeral 2, beginning with the words "Based on" and ending with the words "at this site," and *insert* in place of the deleted paragraph the following new paragraph: "Notwithstanding the findings of the jury set out in the special verdicts above, it is judicially determined and declared as a matter of law that plaintiff is not entitled to insurance coverage under the Plaisted/London insurance policies enumerated above for the policy periods of August 4, 1964 through October 1, 1970 at the Andover site."

b. In the following eight places, *delete* the words "the anti-stacking qualifications of the 'all sums' analysis (per *Armstrong World Industries* and *Keene Corp.*)" or the words "the anti-stacking qualifications of the 'all sums' analysis pursuant to *Armstrong World Industries* and *Keene Corp.*" or the words "the anti-stacking qualifications of the 'all sums' analysis pursuant to *Armstrong* and *Keene Corp.*", as appropriate, and *insert* in place of the deleted words the new words "the provision that only the policy limits of London umbrella and excess policies in effect as of July 1 in one of the policy periods in which coverage is triggered for a single occurrence can apply to property damage attributable to that occurrence, but that if coverage for that occurrence is triggered in more than one policy period FMC may select the policy period in which the policy limits are to be fixed":

i. In Document (5) at page 7, lines 11-12.

ii. In Document (5) at page 10, lines 11-13.

iii. In Document (6) at page 5, lines 6-7.

iv. In Document (6) at page 7, lines 26-27.

v. In Document (7) at page 5, lines 19-21.

vi. In Document (7) at page 8, lines 7-8.

vii. In Document (8) at page 6, lines 9-11.

viii. In Document (8) at page 9, lines 21-23.

c. In Document (2), *delete* the section numbered 7 on page 22, beginning with the words "Based on the findings" and ending with the words "(6.156 years) pro rata," and *insert* in place of the deleted section the following new section 7:

"7. Pursuant to *Armstrong World Industries, Inc.* v. *Aetna Casualty & Surety Co.* (1996) 45 Cal.App.4th 1 [52 Cal.Rptr.2d 690], each insurance policy of the London defendants in effect between August 5, 1964, and October 1, 1970, must pay, subject to its policy limits, retentions, underlying insurance limits and other policy language, and subject to the provision that only the policy limits of London umbrella and excess policies in effect as of July 1 in one of the policy periods in which coverage is triggered for a single occurrence can apply to property damage attributable to that occurrence, but that if coverage for that occurrence is triggered in more than one policy period FMC may select the policy period in which the policy limits are to be fixed, all sums that FMC is legally obligated to pay as damages to investigate and to remediate third party property damage for which FMC is liable at the Newark, Leslie Salt, and Dublin Road sites, without any allocation thereof to FMC."

d. In Document (3), *delete* the section numbered 3 on page 15, beginning with the words "Based on the findings" and ending with the words "to October 1, 1970." in subsection c) of section 3, and *insert* in place of the deleted section the following new section 3:

"3. Pursuant to *Armstrong World Industries, Inc.* v. *Aetna Casualty & Surety Co.* (1996) 45 Cal.App.4th 1 [52 Cal.Rptr.2d 690], each insurance policy of the London defendants in effect between August 5, 1964, and October 1, 1970, must pay, subject to its policy limits, retentions, underlying insurance limits and other policy language, and subject to the provision that only the policy limits of London umbrella and excess policies in effect as of

July 1 in one of the policy periods in which coverage is triggered for a single occurrence can apply to property damage attributable to that occurrence, but that if coverage for that occurrence is triggered in more than one policy period FMC may select the policy period in which the policy limits are to be fixed, all sums that FMC is legally obligated to pay as damages to investigate and to remediate third party property damage for which FMC is liable at the Ayer, Kemmerer and Green River sites, without any allocation thereof to FMC."

e. In Document (4), *delete* the section numbered 3 on page 15, beginning with the words "Based on the stipulation" and ending at the end of page 15, and *insert* in place of the deleted section the following new section 3:

"3. Pursuant to *Armstrong World Industries, Inc.* v. *Aetna Casualty & Surety Co.* (1996) 45 Cal.App.4th 1 [52 Cal.Rptr.2d 690], each insurance policy of the London defendants in effect between August 5, 1964, and October 1, 1970, must pay, subject to its policy limits, retentions, underlying insurance limits and other policy language, and subject to the provision that only the policy limits of London umbrella and excess policies in effect as of July 1 in one of the policy periods in which coverage is triggered for a single occurrence can apply to property damage attributable to that occurrence, but that if coverage for that occurrence is triggered in more than one policy period FMC may select the policy period in which the policy limits are to be fixed, all sums that FMC is legally obligated to pay as damages to investigate and to remediate third party property damage for which FMC is liable at the Meadville site, without any allocation thereof to FMC."

As so modified the judgment, as so defined, is affirmed. Each party shall bear its own costs on appeal.

Cottle, P. J., and Mihara, J., concurred.

A petition for a rehearing was denied March 27, 1998, and the opinion was modified to read as printed above. The petition of appellant FMC Corporation for review by the Supreme Court was denied May 27, 1998. Mosk, J., was of the opinion that the petition should be granted.